[No. 28139. Department Two. March 28, 1941.]

DAN THUMLERT *et al., Appellants,* v. FRANK JARVIS *et al., Respondents.*[1]

[1]Reported in 111 P. (2d) 597.

*Simmons & McCann,* for appellants.

*W. C. Hinman* and *Hartman, Hartman, Simon & Coles,* for respondents.

JEFFERS, J.—This is an appeal by plaintiffs, Dan Thumlert and Thumlert, Inc., a corporation, from a judgment dismissing plaintiffs' complaint. The action was instituted by Dan Thumlert against Frank Jarvis and wife. Thumlert, Inc., of which Dan Thumlert is president, was made an additional party plaintiff.

The complaint alleges that Frank Jarvis was entrusted by Thumlert, Inc., with certain deeds, in which the name of the grantee was not written, to property in Hood River county, Oregon; that the deeds were given to Jarvis in trust, in order that Jarvis, as the agent and broker for Thumlert, Inc., might negotiate certain contemplated sales and exchanges of the above property; that, at the time the above deeds were turned over to Jarvis, he executed and delivered to Thumlert, Inc., the following receipt:

"Seattle Aug. 3rd 1937

"Recd of Thumlert, Inc., warranty deed of A. L. Stewart in blank to lots 6-7-8 & 9, Bk 2, Leavens Heights Hood River County Oreg, & a second deed of A L Stewart in blank to Tract 1, 2, 3, 4, 5 & 6, by metes & bounds description, in Hood River County Oreg. & Bill of Sale of A L Stewart in blank to certain personal property according to inventory attached all located in City of

Cascade Locks, Oreg, which instruments I am to use in consumating exchange according to terms of exchange agreement between Thumlert Inc & W Minton with the exception that it is understood one farm is to have a $3800 mtg instead of $2500.00 as specified. Any other change must meet with the approval of Thumlert, Inc before the deeds & Bill of sale can be surrendered. If deal is not consumated within 5 or 6 days the instruments herewith receipted for are to be returned, intact, to Clarence W. Pierce, atty, for Thumlert Inc.

FRANK JARVIS /S/"

It is further alleged that Jarvis, in accepting the trust and in attempting to sell, exchange, and deal with the property belonging to Thumlert, Inc., was acting in his own behalf and for the benefit of the community composed of himself and wife; that, contrary to the terms of the trust, Jarvis pretended to have exchanged all of the above described property for a certain house and lot in Portland, Oregon, whereas only a small portion of the property was exchanged for the Portland property; that such misrepresentations were knowingly made by Jarvis, and were made with the intention of having Thumlert, Inc., rely upon them; that Thumlert, Inc., did rely upon them, and was thereby deceived, and accepted from Jarvis a conveyance of the Portland property, which is reasonably worth the sum of thirty-five hundred dollars; that, after receipt by Jarvis of the deeds above mentioned, he placed his own name in the deeds as grantee, and proceeded to deal with the properties as his own, conveying the same to third parties; that Thumlert, Inc., discovered the fraudulent acts in April, 1938.

The complaint further states that the properties secretly retained by Jarvis were of the reasonable value of fifteen thousand dollars, for which no consideration was received by Thumlert, Inc.; that plaintiff Dan

Thumlert has succeeded to all the rights of Thumlert, Inc., in and to the property and/or for damages for the wrongful conversion of same by defendants.

It is further alleged in the complaint that Jarvis still holds control of the titles to a portion of such real estate, and that some has been exchanged for real estate situated in Seattle, Stevens county, Washington, and Spokane.

Defendants, by their answer, denied generally the allegations of the complaint, and specifically denied that they have any property of any kind belonging to or in trust for plaintiffs, or either of them, or that they are indebted to plaintiffs, or either of them, in any amount.

For a first affirmative defense, defendants allege that Thumlert, Inc., prior to July 21, 1937, was the owner of an equity in the south 55 feet of lot ·10, block 13, Greene's Addition to Seattle, on which was located the Morris Apartments; that one A. L. Stewart was the owner of the land in Cascade Locks, Oregon, described in plaintiffs' complaint, and Stewart was willing to exchange the same for the equity of Thumlert, Inc., in the Morris Apartments, but Thumlert, Inc., was unwilling to accept the property in Cascade Locks, believing that it was not worth more than fourteen hundred dollars; that defendant Frank Jarvis was willing to acquire the property in Cascade Locks, and offered to exchange for the Cascade Locks property the property mentioned in the complaint as the Portland property; that, after Thumlert, Inc., had made a full investigation of all the properties, an exchange of properties was made, whereby Thumlert, Inc., secured the Portland property, A. L. Stewart secured the Morris Apartments, and defendants secured the property in Cascade Locks, Oregon.

It is further alleged that all parties were acting with full knowledge as principals, after inspection and investigation, and Jarvis was not acting as agent of Thumlert, Inc.

For a second affirmative defense, it is alleged that, on November 13, 1937, the attorney for plaintiffs herein, as plaintiff, instituted an action in the circuit court of the state of Oregon for Hood River county, entitled "J. Lael Simmons, Plaintiff, v. Frank Jarvis et al., Defendants," for the recovery of judgment against defendants on a promissory note, causing a writ of attachment to issue, by virtue of which the land in Cascade Locks was attached and subsequently sold by the sheriff to satisfy the judgment rendered in that case against defendants; that plaintiffs in the instant case had actual knowledge of that attachment, and that the property was attached and sold as the property of these defendants; that plaintiffs herein made no appearance in the Oregon suit, and claimed no right in or to the property.

Defendants, as a third affirmative defense, allege that there was instituted in the superior court for King county, on September 13, 1937, an action by A. L. Stewart against these defendants and others, the issues in which action involved the land in Cascade Locks, Oregon, and the Morris Apartments; that such action was settled and, by stipulation of all parties, dismissed; that the agreement and release upon which the dismissal was based, reads as follows:

"Seattle, Washington,
"Feb. 2, 1938
"It is hereby agreed by and between the undersigned that the action between A. L. Stewart as plaintiff and Thumlert Inc. and others as defendants, being case No. 301907 King County Wash. shall be dismissed with prejudice and without costs as to all parties, that A. L. Stewart will execute and deliver his note for $1500,

payable at $25.00 per month beginning February 2nd, 1939 interest at 5% to A. V. Wilson secured by a third mortgage on Lot 1 blk 17 Union Addition to Seattle, Wash.

"That this agreement constitutes a settlement of all claims of every character between each, every and all of the parties hereto.

"(Signed) Ruth Wilson      A. V. Wilson<br>
E. Adelia Jarvis<br>
Lydia Thumlert

Frank Jarvis<br>
A. L. Stewart<br>
Dan Thumlert<br>
Thumlert, Inc.<br>
by Dan Thumlert, V. Pres."

After a motion for new trial had been made by plaintiffs and denied, judgment of dismissal was entered, and this appeal by plaintiffs followed.

Appellants claim the court erred in holding that the settlement agreement entered in the Stewart case disposed of this case; in refusing to make findings of fact in favor of appellants, as alleged in their complaint, and in accordance with the evidence; in failing to enter judgment for appellants; in entering a judgment of dismissal; and in refusing to grant appellants a new trial.

After reading the testimony in this case, consisting of some three hundred and seventy pages, we are so much in accord with the view of the trial court as expressed in its oral decision announced at the close of the case, that we quote therefrom:

"Now the plaintiff starts out with an apartment house, subject to a first mortgage of forty some thousand dollars, subject to a second mortgage of five thousand dollars, subject to taxes and assessments of an unknown amount, and claiming the property is worth—that his equity is worth $30,000.00.

"Well, maybe Mr. Atwood was over-liberal in saying his equity was worth $2,000.00 or $2,500.00. [Atwood's

testimony refers to equity of plaintiffs in the Morris Apartments.]

"So they start out, and Mr. Wilson represents, or claims to represent, at least he collects a note for a commission from this man Stewart who owns property down at Cascade Locks, and the plaintiff says that Wilson was representing him. Well, that is the first interesting feature of the case.

"Then a deal is effected whereby the plaintiff corporation gets some property in Cascade Locks of some unknown value, subject to a mortgage of $3,000.00 or $3,500.00, and subject also to some unpaid taxes.

"Immediately they start a new deal. Now where Mr. Wilson ends and where the defendant starts as the agent for the plaintiff, I would not attempt to say, or whether they ever stopped, one way or the other, but they go and look at two ranches, one in Ellensburg in the Kittitas Valley, and one in Yakima County, in the Sunnyside Irrigation District, and Mr. Thumlert wants to trade for those properties and doesn't know why the deal does not go through, apparently . . .

"Now what was the deal between Mr. Jarvis and the plaintiff? And what was Mr. Wilson's interest? I would not venture an opinion of attempting to arrive at the truth of any phase of it, because there isn't a single one of the three principals involved that agree with the other, or even with themselves.

"If you read their depositions, if you read their testimony I don't think there is hardly anything that stands uncontradicted even from their own lips. . . .

"Well, there has been a lot of testimony here that I am not going to pay any attention to. I couldn't decipher the truth of the matter if I desired. I couldn't make a finding of fact, to save my soul, as to who is right and who is wrong about some of the intricacies of these deals. . . .

"Now we have a lawsuit by Mr. Stewart to rescind the deal with Thumlert, Inc., upon the ground of trickery, fraud and over-reaching. The file marks will show when the complaint was filed. Mr. Wilson, Mr. Jarvis, Mr. Thumlert and his Thumlert Corporation are all parties defendant. The charges of fraud were broad; that this man had been given something worthless and

they had taken valuable property from him. How valuable his property is or was at that time I don't know. Apparently maybe he wanted to trade it for a 'yellow dog' and I think he did it when he bought this apartment house property, but he might not have known it was a 'yellow dog.'

"Well, now, in that action the very issue to be tried and the very settling of the title to his property in Oregon was this: That he had given Thumlert, Incorporated, a deed, that the grantee's name was blank, that Mr. Jarvis' name had been inserted in that deed and that it had been recorded, and they asked to set that deed aside; that Mr. Jarvis had sold a part of this property to Mr. Hyde for some property in Oregon and they attacked this transaction and wanted to set it all aside.

"Mr. Jarvis files an answer in which he stated he had the deed, that the property belonged to him, that he had sold part of it to Mr. Hyde; he wished that transaction confirmed by the court and he wished also the transaction confirmed of his having title to the balance of the property.

"There can be no question in the mind of the court or even from the testimony in this case that Mr. Thumlert knew it was involved. He met Mr. Jarvis and they talked this over and then what happened? I am still not clear either from Mr. Jarvis' testimony or from the plaintiff just exactly what their deal was about the Oregon property.

"They signed a stipulation for dismissal of that case. The stipulation is in evidence here. It not only provides that the action be dismissed but that each and every party releases each and every other party from all claims of any kind or character. Remember the issue that is involved. Remember the pleadings—and all sides are released.

"In my opinion that disposed of this case because they settled the other case and therefore it is res adjudicata so far as this case is concerned."

This is an action based upon fraud and deceit.

We are of the opinion the trial court might well have based its judgment of dismissal upon a failure of proof

on the part of appellants, but we are also of the opinion the judgment was proper because of the release agreement entered into by the parties to this action in the case of A. L. Stewart v. Thumlert, Inc., *et al.*, to which reference has been made.

Appellants, in their brief, open their argument with the statement that

"The so-called settlement agreement on which the trial court seems to have rested his decision that it 'disposed of this case' and 'is *res adjudicata* so far as this case is concerned' could hardly be so construed when one has in mind the fact that the parties litigant in this cause were co-defendants in that case, and the only issues raised in that case were issues between Stewart and these parties in which these parties had a joint and common interest. . . . It could not have been and was not in the mind of the appellants in signing that agreement that they were thereby confessing absolute ownership in the respondent Jarvis of their property at Cascade Locks, Oregon."

Appellants further state that it is a well established principle of law that a stipulation of the character entered into in the Stewart case must be interpreted in the light of all the surrounding circumstances, to ascertain the true intent of the parties signing the same, citing *Shannon v. Prall,* 115 Wash. 106, 196 Pac. 635, and *Bakamus v. Albert,* 1 Wn. (2d) 241, 95 P. (2d) 767.

While it is true that in the *Shannon* case, *supra,* we stated that the scope and effect of a release must be gathered from its terms, which may be interpreted in the light of the surrounding facts and circumstances, we also stated:

"The release, being general, would reach an obligation owing by the respondent which was not mentioned therein. [Citing cases.] . . .

"It is said, however, that particular obligation was not in the minds of the parties at the time the release

was signed; but this was not necessary. *Hyde v. Baldwin,* 17 Pick. (Mass.) 303."

Let us now examine the facts which we believe it was established existed at the time the release agreement in the Stewart case was signed on February 2, 1938.

Prior to July 15, 1937, Thumlert, Inc., of which Dan Thumlert is president, was the owner of an equity in the Morris Apartments, in Seattle. This apartment house was encumbered with a first mortgage of about forty-five thousand dollars, and a second mortgage of five thousand dollars, together with delinquent taxes and assessments of at least twenty-eight hundred dollars. A. M. Atwood, a real estate man of long experience in Seattle, testified that, under the situation shown to exist, the equity of Thumlert, Inc., in the Morris Apartments, in July or August, 1937, was of the market value of two thousand or twenty-five hundred dollars. Thumlert, Inc., wanted to exchange this apartment house for other property.

A. V. Wilson was a licensed real estate broker in Seattle, and he and Jarvis went to see Dan Thumlert, as a result of which interview, Wilson, Jarvis, and Thumlert drove to Cascade Locks, Oregon, where they looked at some property belonging to A. L. Stewart. A few days later, in Seattle, a deal was closed whereby Thumlert, Inc., received the property of Stewart in Cascade Locks, and Stewart got the Morris Apartments. Stewart made out the deeds to his property, leaving the name of the grantee blank, and these deeds were left in the office of the then attorney for Thumlert, Inc. We are satisfied, from the evidence, that in this deal A. V. Wilson was the agent of Thumlert, Inc., that Jarvis was only assisting Wilson, to the extent of furnishing transportation and providing some of the other necessary expenses, and that it was agreed be-

tween Wilson and Jarvis that for such services Jarvis was to get fifty per cent of what Wilson received for making the deal. It appears that Wilson was to get fifteen hundred dollars for making the deal, but that he has never been paid, although Thumlert claims to have paid him two hundred dollars.

Shortly after the consummation of the Stewart deal, Wilson suggested to Thumlert that he thought he could make a trade of the Cascade Locks property for some farm property in the Yakima valley, so Wilson, Jarvis, and Thumlert went to Yakima, where they met a Mr. Minton, who showed them his property. On this trip Jarvis again furnished the automobile for the trip, but Wilson was the one who attempted to make the deal. For some reason not appearing in the record, the Minton deal was never closed.

Jarvis testified that it was just before starting on this trip to Yakima that the deeds to the Cascade Locks property were turned over to him, and he gave the receipt hereinbefore mentioned. Jarvis testified that Thumlert said he did not want to turn the deeds over to Wilson.

Shortly after the Minton deal, Jarvis informed Thumlert that he thought he could make a trade of the Cascade Locks property for a house and lot in Portland. This is the first time it appears that Jarvis was acting other than as an assistant of Wilson, although, as stated by the trial court, it is difficult, if not imposible, to determine just what relation existed between the parties in the various deals.

Jarvis testified that he told Thumlert that it would take some time and considerable expense to make this deal, and that he would like an option on the Cascade Locks property, so that, if he made the deal, he would have a chance to make something for himself. Jarvis

further testified that Thumlert gave him an oral option. Thumlert denied giving Jarvis any option.

It appears that Jarvis knew of this property in Portland, which belonged to Mr. Hyde. Mr. Wilson was also in this deal, but just what the relationship between Jarvis and him may have been, we are unable to say. There is considerable dispute as to the value of the Portland property, Thumlert testifying that Jarvis represented to him that the property was worth fifty-five hundred dollars, or that he could get a loan of fifty-five hundred dollars on it, which statement Jarvis denied.

Jarvis testified that, before the Hyde deal was closed, he went to Seattle and talked to Thumlert about it, and Thumlert told him to go ahead. Hyde testified that, before he closed the deal, he wired Thumlert to see if Jarvis had authority to give a deed, and that he received word from Thumlert that Jarvis had legal title to the Cascade Locks property. Thumlert denied talking with Jarvis. Jarvis then proceeded to fill in his name as grantee in the Stewart deeds, which apparently he had retained since the Yakima trip, and had them recorded on August 27, 1937, after which Jarvis gave a deed to Hyde for part of the Cascade Locks property, and had a deed made by Hyde to Thumlert, Inc., for the Portland property. This deed Jarvis subsequently turned over to Thumlert.

On September 13, 1937, A. L. Stewart started an action in the superior court for King county, against Thumlert, Inc., Dan Thumlert and wife, A. V. Wilson and wife, Frank Jarvis and wife, and Oscar C. Hyde and wife, alleging that the defendants, with the exception of Hyde and wife, had conspired, through trickery, fraud, and deceit, to defraud him of his Cascade Locks property. He further alleged that the property stood

in the name of Jarvis, and that Jarvis had conveyed some of it to Hyde.

The defendants in the Stewart case filed separate answers, and the answer of Jarvis and wife alleged, among other things, that they were the owners of the Cascade Locks property; that such ownership was in no way connected with the transaction between Stewart and Thumlert, Inc.; and that Jarvis and wife paid a good and valuable consideration for the property. Jarvis testified that, after he was served with summons in the Stewart case, he went to see Thumlert, and they read the complaint and discussed the matter of a defense to that action; that, in that conversation, Thumlert asked Jarvis what part of the Cascade Locks property he had traded to Hyde, and Jarvis informed him that he had deeded to Hyde everything west of the road, or the river side of the road, and that he (Jarvis) retained the property on the upper side of the road. Thumlert denied that Jarvis so informed him.

It further appears that, on November 17, 1937, Mr. Simmons, now attorney for appellants, as plaintiff, brought an action against Jarvis on a note, in the circuit court for Hood River county, Oregon, and attached all the Cascades Locks property standing in the name of Jarvis; that subsequently judgment was rendered against Jarvis in that action, and the property attached was sold to satisfy the judgment. There is testimony to the effect that, shortly after Jarvis was served with process in the Simmons suit, he was informed by Thumlert that the Cascade Locks property had been attached. Thumlert denied making any such statement.

Under the facts stated herein, and many others appearing in the record, which point to the conclusion we have reached, we are convinced that, when Thumlert, Wilson, and Jarvis signed the release agreement on February 2, 1938, Dan Thumlert knew that Jarvis

had inserted his name as grantee in the Stewart deeds; that the property had stood in the name of Jarvis since the date, at least, of the Hyde deed; and that Jarvis was claiming title to all the Cascade Locks property other than that deeded to Hyde.

We are satisfied that any and all claims, which Thumlert, Inc., or Dan Thumlert might have had against Jarvis, growing out of Jarvis' handling of the Cascade Locks property, were released by the agreement of February 2nd. We hardly see how a release could have been more broadly worded. We again call attention to the case of *Shannon v. Prall,* 115 Wash. 106, 196 Pac. 635, cited by appellants, but which we believe sustains our conclusions herein.

Appellants further contend there was no consideration for the release, in so far as Jarvis was concerned. We do not feel justified in going further into this record, other than to say that it shows various claims were made by Jarvis against Wilson, Thumlert, Inc., and Dan Thumlert, and by Wilson against Jarvis, Thumlert, Inc., and Dan Thumlert, and various contentions were made by appellants as to Wilson and Jarvis. In view of this situation, we think the mutual releases in the Stewart case were sufficient consideration one for the other. 53 C. J. 1206.

For the reasons herein assigned, the judgment of the trial court is affirmed.

Robinson, C. J., Beals, Millard, and Simpson, JJ., concur.