Lee ATKINS et al., Appellants,

v.

Nettie Edna WOMBLE, Appellee.

No. 15196.

Court of Civil Appeals of Texas.

Dallas.

Jan. 25, 1957.

Rehearing Denied April 12, 1957.

J. E. Abernathy, McKinney, Freels, El-
liott & Nall, Sherman, John C. Harris, Wil-
liam H. Duls, Burford, Ryburn, Hincks &
Ford, F. M. Ryburn, Bruce Graham and
Clarence Guittard, Dallas, for appellants.

Gullett & Gullett, Denison, Roland Boyd,
McKinney, Strasburger, Price, Kelton, Mil-
ler & Martin, Hobert Price, Dallas, for
appellee.

DIXON, Chief Justice.

This is a will contest involving two wills
of Charles Thomas Tatum, Deceased, of
Collin County, Texas, who died December
19, 1952, at the age of eighty years, leav-
ing an estate valued at more than a million
dollars.

Appellee Nettie Edna Womble was one
of the beneficiaries under the first will, and
was the sole beneficiary under the second
will. She had been Tatum's housekeeper
for nineteen years prior to his death. She
claims also to have been his common-law
wife.

Appellants are Lee Atkins and O. E.
Carlisle, the two independent executors
named in the first will, and Buckner Or-
phans Home and Scottish Rite Hospital for
Crippled Children, two of the several bene-
ficiaries named in the first will.

The case also involves two settlements
and accompanying releases executed by ap-
pellee Nettie Edna Womble. Appellants
contend that by these settlements and re-
leases appellee Nettie Edna Womble vol-
untarily gave up her right to take under
the second will, hence is no longer an "in-
terested person" as to said second will
within the meaning of old Art. 3339, Ver-
non's Ann.Civ.St., and Sections 3(r), 10,
and 76 of Texas Probate Code, V.A.T.S.;
therefore she is not entitled to make ap-
plication for the probate of the second will.

I. The First (1945) Will.

The deceased left a will dated May 25,
1945. It is the will in which Atkins and
Carlisle are named independent executors.
By its terms appellee Nettie Edna Womble
was devised fee simple title to 150 acres of
land to be of her selection, the sum of $10,-
000 cash, an automobile, and all of the
household and kitchen furniture of the de-
ceased. This will also provides for the
following bequests: To testator's friend
Ray U. Hess, 150 acres of land to be se-
lected by him, and $10,000 in cash; to Ray
U. Hess as Trustee for his son Jimmie
Hess, $5,000 in cash; to Joy Womble
Smith (daughter of appellee Nettie Edna
Womble) as Trustee for her children, $5,-
000 in cash; to R. B. Beaver, $5,000 in
cash; to the Baptist Church of Farmers-
ville, Texas, certain real property in the
town of Farmersville, Texas and $5,000 in
cash; to the Baptist Church of Farmers-
ville, Texas, $2,500 in trust for the main-
tenance of testator's burial plot in the Odd
Fellows Cemetery; and $2,500 in trust for
the burial plot where testator's relatives
are buried.

The 1945 will also provides that after the
above legacies have been delivered and
conveyed to the named beneficiaries, the
remaining property of the estate shall be
converted into cash and one-half paid to
Buckner Orphans Home and the other half
to the Scottish Rite Hospital for Crippled
Children in Dallas, Texas.

Appellee Nettie Edna Womble was fa-
miliar with the terms of the above will.
She was in the office of Will Abernathy,

Attorney, when it was written. The will was first put in a safe, to which Tatum gave appellee Nettie Edna Womble the combination. She kept the combination in her own safety deposit box. After Tatum's death appellee Nettie Edna Womble gave the combination to O. E. Carlisle, one of the executors, but as Carlisle was unable to work it, appellee herself unlocked the safe. The 1945 will was taken out of the safe in the presence of appellee Nettie Edna Womble, O. E. Carlisle, Lee Atkins, R. B. Beaver and Ray Hess. On the same day appellee Nettie Edna Womble, with O. E. Carlisle, Lee Atkins, R. B. Beaver and Ray Hess, the same parties present when the will was taken from the safe, went to the office of Attorney Jewell Abernathy (Will Abernathy, who had written the will, had meantime died). The Attorney read the will in their presence. Application to probate the will was filed December 22, 1952. The will was probated January 5, 1953 without a contest.

Thereafter the executors proceeded to carry out the instructions contained in the . will. Appellee Nettie Edna Womble was given the $10,000 cash, the automobile, the household and kitchen furniture, including a washing machine and a refrigerator. She also made a formal selection of the 150 acres devised to her. The land she selected included the testator's home.

The executors also paid Ray Hess his $10,000 legacy and gave him a deed to 150 acres of land selected by him; paid Joy Womble Smith, appellee's daughter, the $5,000 legacy in trust for her children; paid Ray Hess the $5,000 legacy in trust for his son; paid R. B. Beaver his $5,000 legacy; gave the Baptist Church of Farmersville its $5,000 legacy and a deed to the real property in the town of Farmersville, and the two $2,500 cemetery trust funds; and paid Buckner Orphans Home and the Scottish Rite Hospital for Crippled Children each $100,000.

## II. The Releases.

But appellee Nettie Edna Womble was not satisfied. She felt that more was due

her than had been left to her under the 1945 will. She had in mind other claims against the estate, the nature of which will be described later in this opinion. Sometime in August 1953 she reached a settlement agreement with the executors as to her other claims, whereby for a consideration of $25,000 cash and 473.44 acres of land—which was in addition to the property received by her as her bequest under the 1945 will—she released her other claims against the estate. Thus appellee Nettie Edna Womble received as her legacy under the will and in settlement of her other claims a total of $35,000 cash and 623 acres of land. On August 17, 1953 the conveyance to her of the above properties was completed and she signed releases for the property received by her as a bequest under the 1945 will, and a release for the property received by her in settlement of her other claims against the estate.

As the legal effect of the release of her other claims is a material issue in this case, we here present a copy of it in its entirety except as to a lengthy description of the 473.44 acres of land, and the acknowledgments of the parties taken before a notary public:

"State of Texas)
County of Collin)

Know All Men By These Presents:

"Whereas, the last will and testament of C. T. Tatum, now deceased, has been probated and now appears of record in the Probate Minutes of Collin County, Texas; and

"Whereas, Lee Atkins and O. E. Carlisle have duly qualified as Executors of the Estate of C. T. Tatum, deceased, as provided in said will; and

"Whereas, Nettie Edna Womble has made a claim against the Estate of C. T. Tatum, deceased, for services rendered to C. T. Tatum, during his lifetime, which claim has been duly presented to the Executors for their approval or disapproval; and

"Whereas, it is the desire of the said Nettie Edna Womble and the Executors of the Estate of C. T. Tatum, deceased, to compromise said claim; *and it is the further desire of said parties to settle finally and completely all equities existing between the estate of C. T. Tatum, deceased, and the said Nettie Edna Womble, so that said estate will be fully and completely released of all claims of the said Nettie Edna Womble now has or that may arise in the future;*

"Now, Therefore, Know All Men By These Presents: this Contract and Agreement of Settlement entered into this day by and between Nettie Edna Womble, hereinafter called Party of the First Part and O. E. Carlisle and Lee Atkins, as Independent Executors of the Estate of C. T. Tatum, deceased, hereinafter called Parties of the Second Part:

### "Witnesseth

"That the Parties of the Second Part, acting in their capacity as Executors of the Estate of C. T. Tatum, deceased, have this day delivered to the Party of the First Part the sum of Twenty-Five Thousand ($25,000.00) Dollars, in cash and that in addition thereto, they have this day delivered a deed to the following described property, to-wit: * * *.

"The Party of the First Part here acknowledges receipt of the payment to her of the sum Twenty-Five Thousand ($25,000.00) Dollars, in cash, and she further acknowledges receipt of the Deed to her of the above described property and in consideration thereof, the Party of the First Part completely, fully and finally releases and discharges the Estate of C. T. Tatum, deceased, from all claims which she may now have or for any claims that may arise in the future arising out of or connected with any services which she rendered the said C. T. Tatum during his lifetime; *and the Party of the First Part completely, fully and finally releases and discharges the Estate of C. T. Tatum from any claims, rights or causes of action that she might now have having to do with any* rights, titles or interests in any portion of said estate, whether it be land, monies, securities, or accounts receivable, or notes receivable (except that property and money that she is to receive under the will) and the Party of the First Part further agrees to execute any further instruments that may hereafter be required to evidence the fact that the payment here made is in full settlement of any claims that she might have against said estate and that the same is a full release of the Estate of C. T. Tatum, deceased, the Executors and their successors in office and the residuary beneficiaries.

"It being understood by all of the parties that the Party of the First Part rendered services to the said C. T. Tatum during his lifetime and to the Estate of C. T. Tatum since his death, that she has presented to the Executors a claim for said services and that the parties hereto have reached an agreement and compromised as to the payment of said claim; *that this release is evidence of the fact that the Party of the First Part has fully considered said settlement agreement and is satisfied with the same, that the Party of the First Part fully understands that this is in full, complete and final settlement of any and all claims of every kind and character which she has against said estate.*

"Witness Our Hands this the 17 day of August, 1953.

|  | Party of the First Part |
|---|---|
| (Signed) | Nettie Edna Womble. |

|  | Parties of the Second Part |
|---|---|
| (Signed) | O. E. Carlisle |
| (Signed) | Lee Atkins." (Emphasis added.) |

The above written release was filed for record at 4:30 o'clock P.M. August 17, 1953, in the office of the County Clerk of Collin County, Texas as shown by the endorsement of W. C. Hagy, County Clerk, by Robbie Rafer, Deputy.

### III. The Second (1952) Will.

On June 1, 1954, appellee Nettie Edna Womble filed an application for the probate of an instrument offered as a holographic

will of Charles Thomas Tatum. We herewith present a copy of this will:

"Dec. 9th, 1952.

"I C. T. Tatum being fully minful uncertain of death I will all my estate to Nettie Edna Womble I want her taken care off".

Appellee Nettie Edna Womble had known all along of the existence of the above document. She knew of it in August 1953 when she accepted the property in settlement of her bequest under the 1945 will and in settlement of her other claims against the estate. She knew of it when she signed the releases on August 17, 1953. According to her own testimony she was present when Charles Thomas Tatum had written it on December 9, 1952, ten days before his death. He had handed it to her and had told her to ask for anything she wanted and "If they don't treat you right, stay with them two years or get you an attorney and get it there." She had not told anyone about the existence of the holographic will. She gives two reasons for her failure to tell anyone about it, or to offer it for probate sooner. One reason was that she did not think it was a valid will. The other reason was that she would have been satisfied to abide by the settlement agreements and releases of August 17, 1953, if the executors had kept their oral agreement to pay the taxes on the property she received in the settlements.

## IV. Proceedings To Probate 1952 Will.

Appellee's original application filed in the County Court asking probate of the 1952 holographic will named as defendants all the beneficiaries of the 1945 will. However in the application appellee quitclaimed to all the specific legatees under the 1945 will the property received by them thereunder, but prayed that appellants, the executors and the residuary legatees be required to return to the estate all property received by them. Thus appellants Buckner Orphans Home and Scottish Rite Hospital for Crippled Children became the only beneficiaries

named in the 1945 will from whom appellee demanded a return of the property received under the will. Appellee also alleged that she was the wife of C. T. Tatum, that all property of the estate was community property, and that one-half of the estate should be designated and set aside as her part.

Appellants in reply first filed what they designated as a plea in abatement, but which in effect was a motion to dismiss appellee's application. The grounds alleged were (1) that the acceptance by appellee Nettie Edna Womble of the bequests made to her under the 1945 will was a ratification of that instrument and constituted an unequivocal election to take under the terms of the said will; and (2) that by the settlement contract wherein for $25,000 cash and 473 acres of land appellee released all other claims against the estate, appellee divested herself of any further interest in the estate of C. T. Tatum, and was for that reason not a party in interest, and did not possess the statutory requisites to offer the 1952 will for probate, or to contest the probate of the 1945 will.

Appellants also answered to the merits, repeating in substance the allegations contained in their motion to dismiss, and also alleging undue influence and lack of testamentary capacity as additional defenses.

The Probate Court overruled appellants' motion to dismiss, set aside its order probating the 1945 will, revoked the letters testamentary granted to Atkins and Carlisle, admitted the 1952 instrument to probate, appointed F. L. Hart administrator with the will annexed, ordered him to take possession of all the estate except the legacies which appellee had quitclaimed in her application, found that appellee was the wife of C. T. Tatum and that she was entitled to her share of the community property. All of appellants appealed to the District Court of Collin County.

Before the trial in the District Court appellee filed an amended petition. She repeated her allegations in her first petition, and in addition for the first time pled in defense against the settlement agreement

of August 17, 1953. She alleged that the agreement and release whereby she received $25,000 cash and 473 acres of land is of no force and effect because (1) the settlement contract was without consideration since everything she received under the settlement was already her property under the 1952 will; (2) she was entitled to one-half the estate as Tatum's common-law wife; (3) there was a mutual mistake of fact in regard to the settlement agreement because none of the parties at the time knew there was a valid subsisting will dated December 9, 1952; though she herself knew of the document, she was not familiar with the law in regard to holographic wills, supposing they had to be witnessed to be valid; (4) the executors had agreed to pay all taxes on the property received by her in the settlement; Attorney Jewell Abernathy gave her incorrect legal advice and induced her to sign the contract without reading it.

The first trial in the District Court resulted in a mistrial. Thereafter the cause was transferred to Grayson County for trial.

After transfer of the case to Grayson County appellee filed a third amended petition, the pleading on which she went to trial. In this pleading she abandoned all her allegations of a common-law marriage and eliminated entirely her attack on the settlement agreement of August 17, 1953. Her petition was now limited to a formal application to probate the 1952 will. She did not even ask that the order probating the 1945 will be set aside.

Meantime appellee filed a separate suit in Collin County seeking to set aside and cancel her settlement contract and release of August 17, 1953. So far as the record shows this suit, cause No. 23,093, styled Nettie Edna Womble v. Lee Atkins et al., is still pending in the District Court of Collin County, Texas.

When the instant case came on for trial in the District Court of Grayson County, the court first took up appellants' motion to dismiss appellee's application to probate the 1952 will. After hearing evidence, the court overruled appellants' motion.

Then the court took up appellee's exception to appellants' answer to the merits. In addition to their motion to dismiss, appellants in their answer to the merits had pled the settlement agreements and releases of August 17, 1953, as defenses to appellee's application. Appellee had levelled exceptions at these allegations. The trial court sustained appellee's exceptions, and appellants' said allegations were stricken. So appellants were not permitted to plead the settlement agreement and release as a defense in their answer on the merits of the cause. Thus all issues concerning appellee's acceptance of benefits under the 1945 will and also all issues concerning her settlement agreement and release of other claims were completely eliminated from the trial.

The case was tried to a jury. At the conclusion of the testimony appellants renewed their motion to dismiss. The renewed motion was overruled. The only issues submitted related to forgery and testamentary capacity. The jury found these issues in favor of appellee. Judgment was accordingly rendered admitting the 1952 will to probate.

### V. Testimony In Re Motion to Dismiss.

As we have concluded that the court's action in overruling appellants' motion to dismiss constituted reversible error, we deem it proper to set out material parts of the evidence produced at the hearing on the motion, especially the testimony of appellee Nettie Edna Womble.

Appellants introduced the written instruments of August 17, 1953, whereby appellee Nettie Edna Womble accepted the bequests made to her under the 1945 will and the property conveyed to her in settlement of other claims against the estate and released her claims against the estate. Then they introduced material portions of her testimony given by her at the first trial of the cause in the District Court in Collin County.

Mrs. Womble testified that she received the property devised to her under the terms of the 1945 will, also the other property given and conveyed to her in the settlement agreement, and that she signed the written releases.

We quote other material portions of her testimony:

### (1) In Re 1952 Will

"Q. Anyway, that instrument that you said you had back there, whenever you come up to the bank to sign those papers, did you tell Mr. Atkins or Mr. Carlisle or Mr. Abernathy that you had that will? A. I did not.

"Q. Where was it at that time? A. What are you talking about? Where is what?

"Q. That paper that you filed in here dated December 9. When you were up— A. The will you are talking about, it was at home in my quilt box in that billfold.

"Q. *Whatever it was, the one that you now file which you claim to be a will, at the time you were in the Directors Room in the Bank signing these papers, it was in your home in your quilt box, wasn't it?* A. *Sure.*

"Q. *And you knew just exactly where it was, didn't you?* A. *I did.*

"Q. And at that time when you signed these papers in the Directors Room there in the Bank, was there another living person on this whole globe who knew where it was besides you? A. No. * * *

"Q. *When you held out your hand and accepted that $10,000.00 as given you under that first will, did you then know that this other document was at home in your quilt box?* A. *I sure did.* * * *

"Q. * * * When you learned that these executors were negotiating with Mr. Ray Hess to give him that 150 acres of land under that will of 1945, you did not tell them not to do it, did you? A. I did not.

"Q. When the executors gave to your daughter, Joy Womble Smith, $5,-000.00 you didn't tell the executors not to give that money to your daughter, that you had an instrument that would give it every bit to you, did you? A. I didn't say anything.

"Q. *You, of course, had not forgotten the fact that it was in your quilt box?* A. *No. I knew where it was all the time. Really I didn't think it was any good.*

"Q. *Regardless of what you thought, you didn't ask anybody if it was any good did you?* A. *No.* * * *

"Q. If you expected Mr. Abernathy to give you advice, did you expect him to tell you what your rights were under this instrument you had in your quilt box? A. He didn't know about it.

"Q. You didn't expect him to tell you about it, did you? A. *Being as you are putting it like that, I went to Mr. Abernathy's office—Mr. Abernathy remembers it—I believe it was either in the last part of June or middle of July—and I asked him in case I should make up my mind that I would want to write a will in longhand would it be any good.* * * *

"Mr. Graham: *Why did you ask him that?* A. *I was trying to get information to see if this writing that you all call—that I had in the quilt box, if there was any value to it.*

"Q. *Was that before you signed up these papers?* A. *Yes, sir.*

"Q. *And you had way back in your mind back there—you had that piece of paper that you had in that quilt box, you had that in mind when you asked Mr. Abernathy that?* A. *I did.*

"Q. Why didn't you tell him you had it? A. I just didn't want to. I was trying to get some information. * * *

"Q. Did he tell you that a will that was written in the handwriting of a person, wholly in his handwriting, didn't have to have witnesses? A. No. He left the expression that it wasn't any good.

"Q. Left the expression? A. He sure did. And the way he would go around it. He said unless anybody could be positive that it was your handwriting, that it would be much better if you would go and get you an attorney to write you one. He even suggested that he would write it for me.

"Q. Did you leave the impression with Mr. Abernathy that you wanted the will written for yourself? A. I was just asking a question in case that I would want to write one in longhand. I tried to get information just to see what I had was any value to it. I did know it was a will.

"Q. You were trying to leave the impression with Mr. Abernathy that you were making an inquiry about a will that you yourself wanted to make, were you not? A. Yes, I wanted to get the information to make up my mind.

"Q. You had way back there in your mind whether or not that piece of paper you had was good, didn't you? A. I didn't think it was any good, and so I left his office and I didn't think it was any good.

"Q. You were not giving him the facts about what you were thinking, were you, Mrs. Womble? A. We don't usually give everybody our facts about what we are thinking; no. * *.

"Q. You didn't intend for him to know about that one you had in that quilt box, did you? A. If they had

kept their word this will would have never, never come out.

"Q. In other words, you would not have ever brought it from that quilt box if the executors had kept their word? A. That's right. * * *

"Q. The question is, if they had paid the taxes you would not have ever drawn that paper out of that quilt box and never would have said a word about it, would you? A. No.

"Q. And until this good day nobody but you would have ever known about that paper in that quilt box if they had just paid your taxes? A. If they had paid the taxes and kept their word, I would have burned that paper up. * * *

"Q. When you signed that paper in the bank you understood or it was your impression that by accepting that $25,000.00 and 473 acres that they were turning loose of it in an endeavor to get you to turn loose of all claims that you might have against the estate? You understood that, didn't you? A. If they had carried out their word there would have been nothing of this stuff.

"Q. That's what I'm asking you. If they had gone ahead and paid the taxes it was your understanding that the $25,000.00 and 473 acres—that would have wiped out any and all claims you had? A. It would, yes.

"Q. And you intended it that way, didn't you? A. I intended for it to be that way. * * *

"Q. But you had already, before that visit they made to your home, you had already agreed with them on the terms of the settlement, had you not? A. We had, on them conditions that they were to pay all taxes and collect all the revenue on it for '53. Yes, sir.

"Q. But you still understood at that time that if they did that, then you

wouldn't have any more claims against the Tatum estate? A. That's right.

"Q. As a common-law wife or half of his property or— A. Or any part of it. I was willing to settle just for what I asked for.

"Q. And your agreement, part of it, was not to bring that up, the December 9th document? A. I would never have brought that up if they had kept their word.

"Q. What I mean, you had back in your mind that you would not bring it up? A. I didn't only just have it in my mind, I meant to do it. I keep my word.

"Q. And you were serious about that, weren't you? A. I sure am. * * *.

"Q. But what you were wanting the money for was because you thought you were entitled to more of the estate of C. T. Tatum than was given you under the '45 will? That wasn't enough, was it? A. I was only repeating Charlie's words. He said—

"Q. Let's get off Charlie's word. Let's get what you are—(Objection)

"Q. Go ahead and finish your answer and then I will ask you to answer my question. A. The question that we were talking about is what Mr. Tatum wanted me to have. I told Mr. Tatum that I did not want all of his estate.

"Q. We have already gone over that. Let's get on to something we haven't gone over. A. Charlie said for me to ask for anything that I wanted. Anything. * * * But I wasn't asking anything for services. I only wanted what Charlie wanted me to have and I wanted what I asked for.

"Q. You were not asking for all of the estate, were you? A. No. * *

"Q. All right. Let's get back to the conversation, if you will, between Mr.

Abernathy that led up to the time you walked out of the Bank with that $25,-000.00 and the deed to 473 acres of land. Let's get back to that. What did you think you were getting that money for if it wasn't for services which you rendered Mr. Tatum? A. Just to get Mr. Tatum's wish carried out, like he told me to do.

"Q. And you were satisfied to accept that as being full and complete satisfaction of Mr. Tatum's will, weren't you? A. Yes, provided they paid all the tax on it." (Emphasis supplied.)

### (2) In Re Taxes.

"Q. * * * Will you tell the jury wherein they failed to keep their word? Just tell the jury wherein they failed to do it. A. Well, I agreed to give them all the rentals of '53, all of it, provided that they would pay all tax on that land I was going to get a deed under. I meant all tax. It would be absolutely clear and I would have no more trouble. All I would have to do from then on would be to render it and pay the taxes from there on. * * *

"Q. What tax was it they didn't pay? A. The tax on the $25,000.00 and the 473 acres of land. * * *

"Q. You don't know what kind of tax it is? A. It is a tax on it all right.

"Q. What have you been told about the kind of tax against it that hasn't been paid? A. I don't know khat you would call it.

"Q. What would you call it? A. All I know it is just a tax against it.

"Q. And you don't have any idea— A. State and County tax are paid.

"Q. What is it that is unpaid? A. I don't know whether it is—what you would call it—an inheritance tax or what kind of tax, but there is a tax. That's as far as I know. * * *"

(3) In Re Claims For Services.

"Q. Now, then, when Mr. Abernathy was coming out to your house time and time again, *they were trying to settle your claim that you wanted more money out of Mr. Tatum's estate, was it? You were trying to settle with them, weren't you?* A. *Yes. But it wasn't for services.*

"Q. *But you did claim you had rendered some services to him, didn't you?* A. *I didn't make no charge for services.* * * *

"Q. *But you were not putting in a claim for services, were you, Mrs. Womble?* A. *I was only telling them what I wanted. I repeated Mr. Tatum's words.*

"Q. Do I understand you now to testify that at no time did you ever claim any money for services rendered to Mr. Tatum? A. I never did get no money for services.

"Q. *Do you now testify under your oath that you never did ask them to pay you for services which you rendered to Mr. Tatum?* A. *No, not for services.*

"Q. *You never did ask them?* A. *No.*

"Q. *And that wasn't your understanding of why you got the $25,000.00, was it?* A. *No.*

"Q. It wasn't your understanding of why they gave you 473 acres of land? A. No.

"Q. It wasn't because you had waited on Mr. Tatum and because you had shaved him and had taken care of him over these years? That wasn't it at all? A. No."

(4) In Re Common-Law Marriage

"Q. And then that's where the common-law marriage proposition came up, wasn't it? A. The common-law marriage didn't come up until June 1.

"Q. Of what year? A. Of '54.

"Q. Is that when the common-law marriage—is that when you decided to put a claim as common-law wife, June 1, '54? A. It is.

"Q. And how did you first put in a —make a public claim to be a common-law wife? How did you do that? You said June. I don't understand what you mean. *In June, 1954, was the first time, Mrs. Womble, that you had ever made a public claim to be the common law wife of Mr. Tatum?* A. *It is.*

"Q. *That is, hold yourself out to the public, willing to come out in the open with it and publicly claim to be his wife?* A. *Nothing only just through the papers that was sent to you all.*

"Q. *In other words, that is when you filed this lawsuit that is now in trial here?* A. *The one we are on right now.*

"Q. When you were called to Mr. Boyd's office to sign those papers you did sign them with your own name, didn't you? A. I did.

"Q. *And that paper was filed in court. Up until that hour, until that time you had never made any public claim anywhere of any kind to be the wife of C. T. Tatum, had you?* A. *Not public, no.* * * *

"Q. Where did you deposit it? A. $10,000.00 in the First National and $25,000.00 in Collin County National in McKinney.

"Q. *In whose account did you deposit that money?* A. *Nettie Womble.* * * *

"Q. And the kind of relations or circumstances with him, *you felt like you had a perfect right to walk off and leave him any time you wanted to, didn't you?* A. *If I had made up my mind for that purpose, yes.*

"Q. *Without a divorce, didn't you?* A. *I wouldn't have had to have a divorce.*

"Q. *That's right. You wouldn't have to get a divorce, and the reason you didn't marry the man was because you didn't want to be tied to him, didn't you?* A. *That's right. We were happy just like we were.*

"Q. That relationship that existed between you and Mr. Tatum wasn't a 'until death do us part', was it? A. It was as long as we wanted to be that way. As long as we were true to each other.

"Q. But at your option you would have felt perfectly free to walk away and leave him? A. He would have been, too.

"Q. Both of you would have been? A. ·That's right. If we had broke our agreement that we had with each other.

"Q. And that was part of your understanding, wasn't it? A. That was our understanding with each other. * * *

"Q. *If they had done that you never would have even claimed to be his wife, would you?* A. *No.*

"Q. Then your claim to be his wife is because they didn't pay your taxes. Is that right? A.. I actually was his wife.

"Q. But you were not going to claim it, were you? A. I would have been quiet, yes. I would have never said nothing, if they had kept their word.

"Q. *And you wouldn't have made a public claim to be his wife if they had paid the taxes?* A. *That's right.* * * *" (All emphasis ours.)

## VI. Conclusions.

Appellants' first three points on appeal are that the court erred (1) in trying the issues of the validity of the alleged 1952 will without determining appellee's interest in offering such instrument for probate; (2) in overruling appellants' motion to dismiss appellee's application to probate the 1952 instrument in view of the fact that undisputed evidence at the hearing showed conclusively that appellee had no further interest in the estate of C. T. Tatum; and (3) in overruling appellants' motion at the close of the evidence to withdraw the case from the jury in view of the documentary evidence and appellee's admissions showing that she had no further interest in the estate.

■ We are of the opinion that under the facts and circumstances presented in this case appellee Nettie Edna Womble, by accepting benefits under the 1945 will, relinquished her right to take under the 1952 will, therefore was not "an interested" person entitled to ask probate of the 1952 will. Portis v. Cummings, 14 Tex. 171; Mc-Whorter v. Gray, Tex.Civ.App., 4 S.W.2d 302; Hardin v. Hardin, Tex.Civ.App., 66 S.W.2d 362; Von Koenneritz v. Hardcastle, Tex.Civ.App., 231 S.W.2d 498; Conzet v. Hibben, 272 Ill. 508, 112 N.E. 305; Dowd v. Dowd, 62 Idaho 631, 115 P.2d 409, 135 A.L.R. 1213.

But her acceptance of benefits under the 1945 will does not furnish the only basis for our holding that appellee has relinquished her right to ask probate of the 1952 will. She is faced also with her settlement agreement and release whereby for $25,-000.00 and 473 acres of land she gave up all other claims against the estate of C. T. Tatum.

■ A valid settlement agreement and a release, until set aside or canceled, are a complete bar to any later action based on matters included in the settlement agreement and covered by the release. Associated Employers Lloyds v. Howard, Tex., 294 S.W.2d 706; Hart v. Traders & Gen. Ins. Co., 144 Tex. 146, 189 S.W.2d 493.

■ We think the rule is applicable in this case. Under the circumstances here present the settlement agreement and release executed by appellee Nettie Edna Womble constitute a bar to any right of action she may have had against the estate of C. T. Tatum based on the 1952 holographic will. Stringfellow v. Early, 15 Tex.Civ. App. 597, 40 S.W. 871; Fore v. McFadden, Tex.Civ.App., 276 S.W. 327; Brown v. Burke, Tex.Civ.App., 26 S.W.2d 415; Wade v. Wade, 140 Tex. 339, 167 S.W.2d 1008; Robbins v. Simmons' Estate, Tex.Civ.App., 252 S.W.2d 970.

■ The release in question, the one copied earlier in this opinion, is general in its terms and is sufficient to cover any claim which the parties had in mind at the time it was executed. Strasser v. Mack, Tex.Civ.App., 184 S.W.2d 337; Erkiletian v. Devletian, 299 Mich. 95, 299 N.W. 821; Thumlert v. Jarvis, 8 Wash.2d 162, 111 P.2d 597; In re Brill's Estate, 337 Pa. 525, 12 A.2d 50; Aljian v. Ben Schlossberg, Inc., 8 N.J.Super. 461, 73 A.2d 290; 36 Tex.Jur. 819; 76 C.J.S., Release, § 51, p. 695.

That the 1952 holographic will was within the contemplation of appellee Nettie Edna Womble at the time she signed the release is evident from her own testimony. She knew at the time that the 1952 document was at home in her quilt box. She says she did not think it was a good will, but she plainly was not certain about it. When she went to see Jewell Abernathy she did not tell him about the 1952 will, but she asked if she wrote a will in longhand would it be any good, one of her purposes being to see if the paper in her quilt box was good. She testified that she had the 1952 will in mind when she signed the release. She further testified that she intended to relinquish all her claims against the estate, that it was her intention not to bring up the December 9th document and she never would have brought it up, but would have burned it, if the executors had kept their word about paying the taxes.

Though the executors at the time of the execution of the release did not know of the existence of the 1952 will, they did know that appellee was making some sort of a claim against the estate other than the bequests given her in the 1945 will. She expressed herself as dissatisfied with what she received under the 1945 will. Tatum had told her she could have anything she wanted, and she wanted what Tatum wanted her to have. Doubtless such statements account for the careful language in which the release is drawn, expressing the desire of the executors themselves and also of appellee to conclude all claims of every kind which appellee might have against the estate, including any claims in conflict with the 1945 will.

■ Since the effect of the settlements and releases was to divest appellee Nettie Edna Womble of any further claims against or interest in the estate of C. T. Tatum, deceased, we think it was proper for the court to take up consideration of appellants' motion to dismiss in limine, that is, preliminarily, before proceeding with a trial on the merits. Moore v. Stark, 118 Tex. 565, 17 S.W.2d 1037. This is true because, if the proof showed, as we think it did conclusively, that appellee had parted with all interest in the estate, then she was not entitled to maintain an action to probate the 1952 instrument even if it were found to be a valid will. The rule applies either to proponents or contestants of wills. Old Arts. 3315 and 3339, V.A.C.S.; secs. 10 and 76, Texas Probate Code; Logan v. Thomason, 146 Tex. 37, 202 S.W.2d 212; Moore v. Stark, 118 Tex. 565, 17 S.W.2d 1037; Abrams v. Ross' Estate, Tex.Com.App., 250 S.W. 1019; Leatherwood v. Stephens, Tex.Com.App., 24 S.W.2d 819; Stenzel v. Fischer, Tex.Civ.App., 195 S.W.2d 254; Arai v. Saenz, Tex.Civ.App., 52 S.W.2d 383; Daniels v. Jones, Tex.Civ. App., 224 S.W. 476; Laros v. Hartman, 152 Tex. 518, 260 S.W.2d 592.

■■ Further, a party's interest in an estate, when challenged, is to be determined in the probate proceedings and as part of the probate proceedings, first in the county court, and on appeal in the district court.

Moore v. Stark, 17 S.W.2d 1037; Abrams v. Ross' Estate, 250 S.W. 1019; McArthur v. Hall, Tex.Civ.App., 169 S.W.2d 724; Plunkett v. Simmons, Tex.Civ.App., 63 S.W.2d 313; Alexander v. State, Tex.Civ. App., 115 S.W.2d 1122; Von Koenneritz v. Hardcastle, Tex.Civ.App., 231 S.W.2d 498; Hardin v. Hardin, Tex.Civ.App., 66 S.W.2d 362. Appellee Nettie Edna Womble could not evade or postpone appellants' challenge to her status as an interested party by filing in the District Court of Collin County a separate suit seeking cancellation of the release whereby she relinquished all further interest in the estate of C. T. Tatum.

■ Appellee cites the case of Baptist Foundation of Texas v. Buchanan, 291 S.W.2d 464, recently decided by this Court, as authority upholding her contention that appellants' challenge of her status as an interested party could not be tried in limine. Our holding in the above cited case has no application here for three reasons: (1) The Baptist Foundation case did not involve the legal effect of settlement agreements and releases, whereby a beneficiary, after the testator's death, gave up her interest in an estate. (2) In the Baptist Foundation case the proponents of a will sought in a preliminary hearing to prove the validity of their will in order to show that an earlier will had been revoked. We held that the validity of the later will was an ultimate issue triable on the merits, not triable in limine. In the instant case appellants' motion to dismiss was properly considered in a preliminary hearing, for it was a challenge of appellee's right to proceed with her application to probate the 1952 will even if that instrument be considered a valid will. (3) It is to be remembered that appellants, following their motion to dismiss, pled the settlements and agreements as part of their defenses on the merits of the cause. Appellee leveled exceptions at these allegations, which exceptions were sustained, and the allegations were stricken from appellants' pleadings. Thus it was at appellee's behest that appellants were not permitted to raise the defenses of settlement and release as issues on the merits. Under the circumstances appellee will not be heard to say that the Baptist Foundation case should control; that is, that in this case the legal effect of the settlements and releases should not have been tried in limine, but should have been tried as issues in a trial on the merits.

■ In her third amended petition, on which she went to trial, appellee abandoned all attacks on the settlement agreement and release. But the trial court considered and heard evidence on appellants' motion to dismiss, which was grounded on the conclusive effect of the agreement and release. Far from pleading to the issue, appellee repudiated it as an issue either in limine, or as to the merits. The failure of appellee to plead is all the more material when it is remembered that Rule 93(j), Texas Rules of Civil Procedure, requires that pleas of failure of consideration shall be verified under oath. And pleas setting up equitable grounds of fraud or mistake must be supported with written pleadings. Under the circumstances we think we must give the settlements and releases their binding effect. London Terrace, Inc., v. McAlister, 142 Tex. 608, 180 S.W.2d 619; Friddell v. Greathouse, Tex.Civ.App., 230 S.W.2d 579.

However in view of the fact that appellee in her brief claims that the settlement agreements and releases were without consideration, we shall briefly comment on such claim and others which might be suggested by appellee's testimony bearing on the effect of the agreements and releases.

■ Appellee contends that the settlements and releases are without consideration because appellee did not receive anything that she would not have received anyway under the terms of the 1952 will. There is no merit in this contention. At the time the release was signed, some months after the testator's death, the 1952

will had not been offered for probate, though appellee knew of its existence. She thought it was not good, or at least had doubts about its validity. Appellee could not then know whether she would receive anything under it, or that it would stand up under attacks that it was a forgery, or that C. T. Tatum lacked testamentary capacity when he wrote it. Rather than litigate these questions and risk losing all, appellee was certainly free to accept the $25,000 and 473 acres of land in consideration of her release of her claim.

■ Appellee in her supplemental brief cites the case of Farrell v. Cogley, Tex. Civ.App., 146 S.W. 315, in support of her contention that her settlement agreement and release were without consideration. The holding in the Farrell case is not applicable here for the reason that the facts here are materially different. In this case if appellee Nettie Edna Womble had already secured an order probating the 1952 will and no contest were pending or threatened, and she thereafter made a purported release in consideration of receiving property that was already hers under the probated will, then the holding in Farrell v. Cogley might be applicable. But an entirely different situation is actually presented here. The 1952 will had not been probated. The property received was not already hers. She had only a right to assert a claim which she herself considered doubtful. And she could never recover the property unless she risked and successfully resisted defeat of her application to probate the 1952 will. The validity of the release of August 17, 1953 must be determined as of the time it was made, and in the light of the circumstances surrounding the parties at that time.

■ Appellee's claim, once asserted but abandoned before trial, that she was entitled to one-half of the estate as common-law wife notwithstanding the release is without merit for two reasons. (1) The facts of the relationship between appellee and Tatum, as testified to by appellee herself, were insufficient as a matter of

law to establish a common-law marriage. McChesney v. Johnson, Tex.Civ.App., 79 S.W.2d 658; Schwingle v. Keifer, 105 Tex. 609, 153 S.W. 1132. (2) If we be mistaken in the foregoing statement, appellee still could not prevail because a claim of community interest does not avoid a valid settlement. Wright v. Wright, 154 Tex. 138, 274 S.W.2d 670; Baldwin v. Baldwin, 134 Tex. 428, 135 S.W.2d 92.

■ We cannot agree with appellee that there was a mutual mistake of fact in this case. Though appellants were not aware of the existence of the 1952 document, they knew that appellee was making an additional claim of some sort against the estate. Of course appellee was well aware of the existence of the document, though she did not know, or was not sure that it was a valid will. Any mistake in the case was a unilateral mistake of law, for which there can be no recovery. Wedegartner v. Reichert, Tex.Civ.App., 218 S.W.2d 304; Lange v. Binz, Tex.Civ.App., 281 S.W. 626; Moreland v. Atchison, 19 Tex. 303; 29 Tex.Jur. 709.

■ In our opinion if the executors as part of the settlement orally agreed to pay taxes—apparently inheritance taxes—such oral promise would not furnish a basis for appellee to avoid the binding effect of the settlement agreements and releases. In the first place we think the parol evidence rule would prevent appellee from testifying about the alleged oral promise. To allow her to do so would be to allow her to vary the terms of written instruments, for none of the written releases she signed contains any promise by the executors to pay taxes. Warren v. Mayhew, Tex.Civ.App., 221 S.W.2d 394. In the second place, if it were true that the executors promised to pay the said tax, their subsequent failure to perform their promise would amount to no more than a partial failure of consideration for which appellee would not be entitled to avoid the releases. 36 Tex.Jur. 806, sec. 9; 45 Am.Jur. 682–683, sec. 16. Appellee in such instance would be relegated to a suit for breach of contract. Nor is ap-

pellee's failure to read the releases, if she did fail to read them, any excuse, or constitute grounds to claim fraud. So far as the record shows no one kept her from reading the instruments before signing them. She was free to do so, therefore will not be heard to complain on that score. Associated Employers Lloyds v. Howard, Tex., 294 S.W.2d 706; Pioneer Building & Loan Ass'n v. Johnston, Tex.Civ.App., 117 S.W.2d 556; Parker v. Schrimsher, Tex. Civ.App., 172 S.W. 165.

■■■ Since the testimony of appellee consisted in the main of statements which must be considered admissions, she is bound by her said testimony. Stanolind Oil & Gas Co. v. State, 136 Tex. 5, 145 S.W.2d 569; Schepps v. American Dist. Tel. Co., Tex.Civ.App., 286 S.W.2d 684; Wedegartner v. Reichert, Tex.Civ.App., 218 S.W. 2d 304; Zamora v. Thompson, Tex.Civ. App., 250 S.W.2d 626; So. Surety Co. v. Inabnit, Tex.Civ.App., 1 S.W.2d 412.

Appellants' first three points on appeal are sustained.

In their brief appellants present forty-two additional points. These additional points allege errors in the trial of the case on the merits, which, if held to be errors, would require us to reverse and remand the cause for another trial, but not to render judgment. For example, several of them urge error in the admission of evidence and several allege improper jury arguments. In view of our sustaining the first three of appellants' points we have decided that it is our duty to render judgment in favor of appellants. If we are correct in so deciding, appellants' other points become immaterial, and we shall not further prolong this opinion by discussing them.

Because we believe the court erred in failing to sustain appellants' motion to dismiss, and erred also in failing to sustain the renewed motion to dismiss presented at the conclusion of the testimony, the judgment of the trial court is reversed and judgment is here rendered, dismissing appellee's application for the probate of the 1952 holographic will of C. T. Tatum, deceased.

Reversed and rendered.

YOUNG, J., not sitting.

On Motion for Rehearing.

DIXON, Chief Justice.

In her motion for rehearing appellee again cites us cases which hold that in a will contest, or a hearing on an application to probate a will, the court is limited to two inquiries: (1) Is the instrument properly executed? (2) Is it the last will of the testator? Among the cases cited are Cate v. Cate, Tex.Civ.App., 235 S.W.2d 456; Pullen v. Russ, Tex.Civ.App., 209 S.W.2d 630; Zaruba v. Schumaker, Tex.Civ.App., 178 S.W.2d 542; Huston v. Cole, 139 Tex. 150, 162 S.W.2d 404; and Ellsworth v. Aldrich, Tex.Civ.App., 295 S.W. 206.

We do not disagree with the holdings in the cited cases, but in our opinion they are not applicable to the hearing in this case on appellants' motion to dismiss. The issues presented by appellants' motion were not concerned with the validity of the 1952 will. They challenge appellee's right to ask probate of the 1952 will regardless of whether that instrument was a valid will or an invalid will. The motion, so to speak, erected a bridge which appellee had to cross *before* she could proceed with a contest of the 1945 will, or with her efforts to probate the 1952 will. The issues presented by the motion, though properly raised in the probate court and on appeal in the district court, were correctly presented in a hearing preliminary to the proceedings to probate the will, and separate and apart from the proceedings to probate the will. This preliminary hearing on the motion to dismiss could not properly be limited to the two issues which, according to the cases cited by appellee, must limit a hearing to probate a will.

In her motion for rehearing appellee says: "This Honorable Court erred in ren-

dering final Judgment against the Appellee herein, after its reversal of the Judgment of the Trial Court, when the only possible judgment that should have been rendered upon reversal of the Trial Court would have been one remanding the cause for a new trial, since this Court has undertaken to render a final Judgment in the case upon issues not before the Trial Court, and not passed upon by the Trial Court, the issues of the effect of the release in this case, appellee's alleged election to take under the 1945 will, and her alleged estoppel not being issues that were adjudicated in the Trial Court in this cause."

As we pointed out in our original opinion, in her third amended original petition, on which she went to trial, appellee abandoned all her allegations of a common-law marriage and eliminated entirely from her pleadings all attacks and defenses in regard to the settlement agreements and releases of August 17, 1953. Her petition was limited to a formal application to probate the 1952 will. Having no pleadings to support them, she could not and did not attempt to prove affirmative defenses, as to which she would have had the burden of proof.

Though appellee did not plead affirmative defenses, appellants, as a basis for their motion to dismiss, did plead the settlements and releases and their far-reaching effect. In addition they introduced the testimony of appellee herself, given at a previous trial, to support their contention that the settlements and releases were intended by the parties to cover and did cover all claims, rights or causes of action that appellee might have against the estate, including any rights, title, or interests in any portion thereof. Under the circumstances it was proper for us in determining the effect, scope and extent of the settlements and releases to look to appellants' pleadings (that is, the motion itself), to the written releases, and to the testimony of appellee herself. That this is so is evidenced by the fact that appellee's testimony was introduced by appellants without objection from appellee. Her testimony revealed what claims she had in mind when she executed the releases. Appellee in her brief devoted considerable time and space to a discussion of issues pertaining to the validity and effect of the releases.

To summarize, we think it was proper for us to comment on appellee's testimony, though she herself did not plead affirmative defenses, (1) because it was proper for us to determine the scope and extent of the releases in the light of appellants' pleading (the motion itself), the express terms of the releases, and appellee's own testimony and the arguments in her brief; and (2) because all of the issues in question were covered by appellee in her testimony, or in her brief, or in both, and were therefore fair subjects for consideration and comment in determining whether to reverse and render judgment, or merely to reverse and remand.

The motion for rehearing is overruled.

YOUNG, J., not sitting.