Sandra Silva de TAMEZ, Individually as Representative of Juan Guadalupe Tamez (Deceased) and as Next Friend of Denise Silva de Tamez, a Minor Child, and Michael G. Willoughby, Appellants,

v.

SOUTHWESTERN MOTOR TRANSPORT, INC., Appellee.

No. 04–04–00182–CV.

Court of Appeals of Texas, San Antonio.

Dec. 8, 2004.

---

566

Jeff Small, Law Office of Jeff Small, J. Felix Gonzalez, Cichowski & Gonzalez, P.C., Ronald A. Ramos, Law Office of Ronald A. Ramos, P.C., San Antonio, for appellants.

Roger D. Kirstein, M. Scott Zimmerer, Langley & Banack, Inc., San Antonio, for appellee.

Sitting: KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Sandra Silva de Tamez, as spouse of Tamez, as the representative of his Estate, and as next friend of Denise Silva de Tamez, a minor child, and Alicia Montalvo de Tamez ("Tamez") and Michael G. Willoughby appeal the summary judgments rendered in favor of Southwestern Motor Transport, Inc. ("SMT"). Tamez sued SMT and Willoughby under the Wrongful Death Act and Survival Statute for personal injuries and damages arising from a tractor-trailer accident. Subsequently, Willoughby cross-claimed against SMT and Edwin Montalvo and counter-sued Tamez, alleging negligence and vicarious liability. SMT filed two separate motions for summary judgment against Tamez and Willoughby, both based on the affirmative defenses of waiver and release. SMT contended that the Release Agreements signed by both Tamez and Willoughby released SMT from liability for any injuries caused by the negligent acts and/or omissions of SMT and/or its employees, officers, agents and/or servants. The trial court granted SMT's motions as to all claims. We affirm the judgment of the trial court.

## BACKGROUND

Juan Guadalupe Tamez died and Michael G. Willoughby was seriously injured when the tractor-trailer in which they were driving crashed into an interstate overpass. At the time of the incident, Tamez and Willoughby were team co-drivers operating a tractor-trailer that Edwin Montalvo Trucking ("Montalvo") leased to Southwestern Motor Transport, Inc. ("SMT") pursuant to an Independent Contractor Service Agreement. Willoughby and Tamez were employees of Montalvo.

Prior to driving for SMT, SMT required that all leased drivers sign a pre-injury release agreement purportedly releasing SMT from any liability due to negligent acts and/or omissions on its part. On March 20, 2001, Willoughby signed a pre-injury release agreement ("Release Agreement"). On May 4, 2001, Tamez signed an identical Release Agreement. On May 5,

2001, Willoughby and Tamez embarked on the trip that is subject of this dispute.

All parties agree that this appeal involves the resolution of a single issue: Is the Release Agreement signed by both Willoughby and Tamez enforceable as a matter of law? We hold that this Release Agreement is a standard third-party release that is valid and binding upon Willoughby and Tamez. Accordingly, we overrule all issues on appeal, and affirm the summary judgment of the trial court.

## RELEASE AGREEMENT

■ A release agreement, valid on its face, is, until set aside, a complete bar to any action based on matters covered in the release. *McMahan v. Greenwood*, 108 S.W.3d 467 (Tex.App.-Houston [14th Dist.] 2003, reh'g overruled). All releases are regarded as contracts and, as such, are governed by the general rules relating to the construction of contracts. *Id.*

### A. Standard of Review

We review a summary judgment *de novo*. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994). Accordingly, we will uphold a summary judgment only if the summary judgment record establishes that there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law on a ground set forth in the motion. TEX. R. CIV. P. 166a©; *Travis v. City of Mesquite*, 830 S.W.2d 94, 99–100 (Tex.1992). In deciding whether the summary judgment record establishes the absence of a genuine issue of material fact, we view as true all evidence favorable to the non-movant and indulge every reasonable inference, and resolve all doubts, in its favor. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

### B. Contractual Requirements

#### 1. Fair Notice

■ Because pre-injury releases involve an extraordinary shifting of risk, we impose certain fair notice requirements. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 507–08 (Tex. 1993). These fair notice requirements include the express negligence doctrine and the conspicuousness requirement. *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex.2004). The express negligence doctrine requires that the parties' intent to release liability from the releasee's own future negligence must be expressed in unambiguous terms within the four corners of the agreement. *Id.* The second requirement, conspicuousness, provides that the releasing language must be conspicuously written, so that a reasonable person against whom it is to operate should notice it. *Id.* Language that appears in contrasting type, colors, or in capitals satisfies the conspicuousness requirement. *Id.* A release that fails to satisfy either of the fair notice requirements of the express negligence doctrine or conspicuousness when they are imposed is unenforceable as a matter of law. *Id.*

■ Here, both fair notice requirements were satisfied. The Release Agreement signed by both Willoughby and Tamez states:

3. *Release.* I hereby agree to RELEASE Carrier from any and all liability for any injury(ies) or other damage(s) to me caused in whole or in part by Carrier and/or its employee(s), officer(s), agent(s) and/or servant(s), *including any and all such injury(ies) and/or damage(s) caused by or resulting from the NEGLIGENT ACT(S) AND/OR OMISSION(S) of Carrier and/or its employee(s), officer(s), agent(s) and/or servant(s).*

The bolding, capitalization, and underlining is as indicated in the original Release Agreement. Here, the release in favor of SMT easily satisfies the requirements of fair notice by reciting specifically that SMT is being released from its own negligence and by using contrasting type to satisfy the conspicuousness requirement.

## 2. Meeting of the Minds

Nevertheless, on appeal, both Willoughby and Tamez assert that summary judgment was improper because fact issues remain regarding what Willoughby and Tamez understood the effect of these documents to be.[1] A release encompasses the contractual element of mutual intent and whether the minds of the parties have met. *See Vera v. North Star Dodge Sales, Inc.,* 989 S.W.2d 13, 17 (Tex.App.-San Antonio 1998, no pet.). Specifically, Tamez contends that because he was limited in his ability to read or write English, he was unable to understand a complex legal document such as the Release Agreement.[2] Therefore, according to Tamez, there was essentially no meeting of the minds and no binding contract of release. We disagree.

To the contrary, a person who signs a contract must be held to have known what words were used in the contract and to have known their meaning, and he must be held to have known and fully comprehended the legal effect of the contract. *Nguyen Ngoc Giao v. Smith & Lamm, P.C.,* 714 S.W.2d 144, 146 (Tex. App.-Houston [1st Dist.] 1986, no writ). Moreover, illiteracy is no defense and will not relieve a party of the consequences of the contract.[3] *Vera,* 989 S.W.2d at 17.

Here, Tamez, a resident alien from Mexico, signed a release that satisfies the elements of fair notice and conspicuously states that "I acknowledge that I have read this Agreement, and fully understand the provisions and convenants contained in this Agreement." Therefore, even though English was not his first language, we must presume, as a matter of law, that Tamez read and understood the contract, unless he was prevented from doing so by trick or artifice. *Vera,* 989 S.W.2d at 17. Because Tamez has not raised an issue regarding fraud, misrepresentation, or concealment in the procurement of the Release Agreement, we hold that it is a valid and binding contract, and Tamez is bound by the terms of the instrument as fully as would those who could, and did not, read it. *See Indemnity Ins. Co.,* 129 Tex. at 173, 101 S.W.2d 553. Accordingly, we overrule this issue on appeal.

## 3. Consideration

In addition, Tamez and Willoughby argue that the Release Agreement must be declared void for lack of consideration. We recognize failure of consideration as an affirmative defense to an action on a written agreement. *See Nat'l Bank of Commerce v. Williams,* 125 Tex. 619, 84

---

1. Because Willoughby did not raise this argument to the trial court, however, he has waived it on appeal.

2. Tamez relies on the testimony of Ida Montalvo: "based on my acquaintance with Juan Tamez for more than five years and my knowledge of his English language capabilities, he could not possibly understand a legal document as complex as the Release Agreement."

3. Absent proof of mental incapacity, a person who signs a contract is presumed to have read and understood the contract, unless he was prevented from doing so by trick or artifice. *Associated Employers Lloyds v. Howard,* 156 Tex. 277, 294 S.W.2d 706, 708 (1956); *Indemnity Ins. Co. of N. Am. v. W.L. Macatee & Sons,* 129 Tex. 166, 101 S.W.2d 553, 556–57 (1937). This is true even in cases in which a party to the contract is illiterate. *W.L. Macatee & Sons,* 101 S.W.2d at 557.

S.W.2d 691, 692 (1935). A release agreement, like any contract, must be supported by valid consideration. *Flatt v. Hill*, 379 S.W.2d 926 (Tex.App.-Dallas 1964, writ ref'd n.r.e.). In accordance with the general rules of contracts, consideration sufficient to support a release must consist of either a benefit to the releasor or a detriment to the person released. *Atkins v. Womble*, 300 S.W.2d 688, 702–03 (Tex. App.-Dallas 1957, writ ref'd n.r.e.). SMT asserts that it provided Tamez and Willoughby with two benefits as consideration for the Release Agreement: (1) the ability to participate as leased co-drivers for its company, and (2) occupational health insurance. With regard to SMT's first item of consideration, we agree.

### a. Ability to Participate as Leased Co-drivers

 First, SMT asserts that it provided valid consideration to support the Release Agreements by allowing Willoughby and Tamez to participate in a voluntary activity to which they had no legal right—the ability to participate as leased co-drivers for SMT. We agree. When the releasor acquires a legal right to which he would not otherwise be entitled in exchange for signing the release, the releasor receives a benefit. *See Atkins*, 300 S.W.2d at 702–03. The Release Agreement, as signed by Willoughby and Tamez, states that "as a condition to me being a driver and a passenger co-driver of one or more trucks operated for Carrier, Contractor and Carrier require that I agree to the release provisions and covenants contained

in this Agreement."[4] Here, Tamez and Willoughby did not have a legal right to participate as leased co-drivers for SMT. They were given the voluntary opportunity, however, as part of their employment with Montalvo, to participate as leased co-drivers for SMT. As a condition to participating in this voluntary activity, SMT required its drivers to sign the Release Agreement. Therefore, by electing to participate as a leased co-driver for SMT, both Tamez and Willoughby accepted the consideration proffered by SMT and granted a pre-injury release in return.

### b. Occupational Health Insurance

 SMT also claims that it provided valid consideration to support the Release Agreement because Montalvo Trucking furnished occupational health insurance to Willoughby and Tamez pursuant to the terms of its Independent Contractor Service Agreement with SMT.[5] We disagree with SMT's contention, however, that this term constituted a statement of consideration for the Release Agreement. While we recognize that it is not necessary that SMT directly furnish the consideration for the Release Agreement, there still must be evidence that the consideration was "bargained for" in exchange for the release. *See TCA Bldg. Co. v. Entech, Inc.*, 86 S.W.3d 667, 672 (Tex.App.-Austin 2002, no pet.) (holding that advantage to party was not consideration when it was neither promised nor given by anyone in exchange for obligations undertaken by party); *see generally* RESTATEMENT (SECOND)

---

**4.** In the Release Agreement, "Contractor" refers to Montalvo, Willoughby and Tamez's employer, and "Carrier" refers to SMT.

**5.** The provision in the Agreement SMT refers to actually provides: "CONTRACTOR agrees to acquire and maintain at CONTRACTOR'S expense worker's compensation insurance acceptable to CARRIER, covering all employees

of CONTRACTOR employed for the purpose of furnishing services under the terms of this Agreement.... CONTRACTOR further agrees that any such worker's compensation insurance policy will contain a waiver of subrogation endorsement, waiving any right of subrogation against CARRIER."

OF CONTRACTS § 71 (1981). The ICS Agreement is a wholly different contract as between SMT and Montalvo Trucking, establishing their rights and duties. There is no indication in the ICS Agreement, and SMT does not cite to one, that would link a provision in its terms to consideration for the later Release Agreement between Willoughby and Tamez and SMT.

Nevertheless, only some consideration is necessary, and we hold that there was valid consideration for the release based on Tamez and Willoughby's ability to participate as leased co-drivers. Accordingly, we overrule this issue on appeal.

## C. Employment Relationship

Therefore, the Release Agreement having satisfied all the contractual requirements of a standard third-party release, Willoughby and Tamez further contend that the trial court erred in entering summary judgment in favor of SMT since a fact question exists with regard to whether they were employees of SMT. If Willoughby and Tamez were employees of SMT, Willoughby and Tamez contend the Release Agreement should be either preempted by federal law or declared void as against public policy. In maintaining that a fact issue exists with regard to this alleged employment relationship, Willoughby and Tamez contend that: (1) they were "statutory employees" of SMT, or, in the alternative, (2) they were SMT's borrowed servants. As to both, we disagree.

## 1. Statutory Employee

First, Willoughby and Tamez contend that they were "statutory employees" of SMT whose waiver of liability provided

under the Release Agreement was preempted by federal law, specifically 49 U.S.C. § 14102 and 49 C.F.R. § 376.12.

## a. Background

■ During the first half of the twentieth-century, interstate motor carriers, like SMT, attempted to immunize themselves from liability for negligent drivers by leasing trucks and nominally classifying the drivers who operated the trucks as "independent contractors." *See Morris v. JTM Materials, Inc.,* 78 S.W.3d 28, 37 (Tex. App.-Fort Worth 2002, no pet.). Therefore, in 1956, Congress amended the Interstate Common Carrier Act ("Act") to require interstate motor carriers to assume full direction and control of the vehicles that they leased "as if they were the owners of such vehicles."[6] *Id.* at 38. The purpose of the amendments to the Act was to ensure that interstate motor carriers would be fully responsible for the maintenance and operation of the leased equipment and the supervision of the leased drivers, thereby protecting the public from accidents, preventing public confusion about who was financially responsible if accidents occurred, and providing financially responsible defendants. *Id.* As a result of the regulatory authority granted in the Act, the Interstate Commerce Commission issued regulations that require a certificated interstate carrier who leases equipment to enter into a written lease with the equipment owner providing that the carrier-lessee shall have exclusive possession, control, and use of the equipment, and shall assume complete responsibility for the operation of the equipment, for the duration of the lease. 49 C.F.R.

---

**6.** Act of Aug. 3, 1956, Pub.L. No. 84–957, 1956 U.S.C.C.A.N. 1163 (current version at 49 U.S.C.A. § 14102(a)(4) (1997)). The current version of the statute contains the same requirement, but it is worded a little differently.

It requires carriers to assume full direction and control of the leased vehicles "as if the motor vehicles were owned by the motor carrier." 49 U.S.C.A. § 14102(a)(4).

§§ 376.11–.12 (2000); *Morris*, 78 S.W.3d at 38. These regulations are known as the Federal Motor Carrier Safety Regulations (FMCSR). 49 C.F.R. subch. B (2000).

Because under the FMCSR, interstate motor carriers have both a legal right and duty to control leased vehicles operated for their benefit, the regulations create a statutory employee relationship between the employees of the owners-lessors and lessee-carriers. *Morris*, 78 S.W.3d at 38–39. The FMCSR preempt state law in tort actions in which a member of the public is injured by the negligence of a motor carrier's employee while operating an interstate carrier vehicle. *Id.* at 39. Thus, an interstate motor carrier's liability for equipment and drivers covered by leasing arrangements is not governed by the traditional common-law doctrines of the master-servant relationship and respondeat superior. *Id.* Instead, an interstate carrier is vicariously liable as a matter of law under the FMCSR for the negligence of its statutory employee drivers. *Id.*

**b. Analysis**

Citing the FMCSR, Willoughby and Tamez contend that, because they were statutory employees of STM for purposes of protecting the public, SMT must be prevented from insulating itself from liability due to its status as third-party rather than employer, and the Release Agreement must be preempted by federal law. *See* 49 C.F.R. § 376.11–.12. We disagree.

Section 376.12 provides that "the authorized carrier lessee shall have exclusive use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1). Nevertheless, paragraph (c)(4) of § 376.12 further instructs the court:

Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

In interpreting and reconciling these provisions, we agree with the rationale of the court in *Pouliot v. Paul Arpin Van Lines, Inc.*, 292 F.Supp.2d 374, 383 (D.Conn. 2003): "The import of this language is plain—the existence of a lease under regulations that impose liability between the carrier-lessee and the public does not have any impact on the type of relationship that exists between the carrier-lessee and the contractor-lessor."

In fact, the Fifth Circuit has specifically held that the policy underlying the FMCSR does not apply as to co-employees of motor carriers injured by their fellow employees' negligence since they could recover from their employer in workers' compensation. *See Price v. Westmoreland*, 727 F.2d 494, 497 (5th Cir.1984); *see also White v. Excalibur Ins. Co.*, 599 F.2d 50, 55–56 (5th Cir.1979). Here, Willoughby and Tamez could recover from Montalvo, their employer, via both occupational health insurance and their common law rights. Accordingly, with regard to statutory employment, we overrule this issue on appeal.

**2. Borrowed Servant**

Second, Willoughby contends that, because SMT retained control over the details of Tamez and Willoughby's work, they were SMT's borrowed employees

and/or SMT was a co- or dual employer with Montalvo, thus making SMT liable for the consequences of Tamez and Willoughby's negligence. Again, we disagree.

Under the "borrowed servant" doctrine, the employee of one employer can become the employee of another "special" employer. In so doing, the central inquiry is which employer had the power to control and direct the employees in the manner and details of their work. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 537 (Tex.2002) (holding that the test for determining whether a person is the employee of the general employer or the borrowed servant of the special employer is which employer controls and gives specific direction to the borrowed employee). Generally, the right of control and direction is a question of contract between the two employers. *See Alice Leasing Corp. v. Castillo,* 53 S.W.3d 433, 440 (Tex.App.-San Antonio 2001, pet. denied). Moreover, where both employers are operating under a contract expressly assigning the right to control, a court can dispose of the borrowed employee issue without the necessity of considering the facts and circumstances of the project. *Id.* Here, the Independent Contractor Service Agreement between SMT and Montalvo explicitly gave Montalvo the right of control over Willoughby and Tamez. Accordingly, we hold that neither Willoughby nor Tamez was an employee of SMT, and we overrule this issue on appeal.

### D. PUBLIC POLICY

Finally, in conjunction with their employment issues, Tamez and Willoughby contend that the Release Agreement was void because it violated public policy. In alleging violations of public policy, Willoughby contends that the Release Agreement was coercive because its execution was procured as a condition of employment; it circumvented the policy favoring the provision of occupational medical coverage for employees under the workers' compensation scheme; and it transferred the risk of job-related injuries from SMT to its employees. A release, just as any other contract, is subject to the public policy of the state. *Ranger Ins. Co. v. Ward,* 107 S.W.3d 820 (Tex. App.-Texarkana 2003, pet. denied).

In addressing the Release Agreement with regard to public policy considerations, all parties principally rely upon the court's analysis in *Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544 (Tex.2001), *superseded by* TEX. LAB.CODE ANN. § 406.033(e) (Vernon Supp.2004–05) ("Any agreement by an employee to waive a cause of action or any right described in Subsection (a) before the employee's injury or death is void and unenforceable").[7] In *Lawrence,* an employee sued his employer for negligence in causing his work-related injuries. *Id.* at 545–46. The employer was a non-subscriber to workers' compensation insurance but provided benefits through an employee benefit plan for employees who elected to participate in the plan. *Id.* Lawrence, the employee, signed an election to participate in the employee benefit plan and, as a requirement for participation, waived his right to recover from the employer for work-related injuries. *Id.* Following work-related injuries, Lawrence argued that the election to participate in the employee benefits plan that included the waiver of his right to sue his employer was void because it violated pub-

---

7. Although *Lawrence* was superseded by statute, *Lawrence* remains the law of those claims, like Tamez's and Willoughby's, brought by workers who both signed agreements and suffered injury before September 1, 2001. *Storage & Processors, Inc. v. Reyes,* 134 S.W.3d 190, 192 (Tex.2004).

lic policy. *Id.* Emphasizing Lawrence's voluntary election between the employer's benefits plan and the employee's right to sue, the *Lawrence* court disagreed and held that the Workers' Compensation Act did not establish public policy prohibiting an otherwise valid pre-injury agreement by which the employee waived common law rights to sue the employer for negligence in exchange for rights to benefits. *Id.* ("Absent any clear indication of legislature intent to prohibit such agreement, we decline to hold them void on public policy grounds").

Applying the *Lawrence* decision, Willoughby and Tamez focus on this voluntary election of rights distinction and allege that they were not free to decline to sign the releases required by SMT, and, furthermore, were not provided any benefits by SMT in return for signing the release agreements. This discernment, however, is inapplicable. The underlying premise of the court's decision in the *Lawrence* case was the existence of an employer-employee relationship. *See Lawrence*, 44 S.W.3d at 544 (applying to actions brought against employers by employees acting in the course and scope of their employment). As discussed above, neither Willoughby nor Tamez were employees of SMT, statutory or otherwise; they were employees of Montalvo Trucking and were merely leased drivers of SMT. As non-employees of SMT, SMT should not be required to provide Willoughby or Tamez with workers' compensation or any other viable and voluntary alternative. Accordingly, we overrule this issue on appeal.

## CONCLUSION

We overrule all issues, and affirm the judgment of the trial court.