# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-50342

United States Court of Appeals
Fifth Circuit

**FILED**

January 29, 2016

Lyle W. Cayce
Clerk

BANCO POPULAR, NORTH AMERICA,

        Plaintiff - Appellant / Cross-Appellee

v.

CYNTHIA R. KANNING, also known as Cyndy Renee Kanning,

        Defendant - Appellee / Cross-Appellant

Appeals from the United States District Court
for the Western District of Texas
USDC No. 1:13-CV-200

Before DAVIS, BARKSDALE, and DENNIS, Circuit Judges.

PER CURIAM:[*]

For these diversity-action cross-appeals from rulings on cross-motions for summary judgment, primarily at issue is the right to life-insurance proceeds. Banco Popular North America contends decedent Christopher Kanning (Mr. Kanning) assigned his life-insurance policy to it as collateral for a loan. Cynthia Kanning (Mrs. Kanning), Mr. Kanning's widow and named beneficiary in the policy, asserts, in part: in deciding the cross-motions, the

---

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 15-50342

district court properly concluded there was no enforceable assignment, but erred in ruling that Banco's attempt to recover the proceeds is not in contempt of her Chapter 7 bankruptcy discharge.  AFFIRMED IN PART, VACATED IN PART, AND SUMMARY JUDGMENT AWARDED BANCO; REMANDED FOR CONSIDERATION OF THE RESULTING RELIEF TO BE AWARDED.

I.

In 2007, Mr. Kanning was president of BEMK, Inc. d/b/a All About Diamonds, a Texas jewelry store.  That October, BEMK sought a loan in the amount of $698,500 through the U.S. Small Business Administration (SBA), for which Banco was the lender.  As discussed below, following negotiations, the loan closed that December.

In response to the loan requested by BEMK, Banco, on 14 October, provided Mr. *and* Mrs. Kanning with a financing proposal "for discussion purposes only . . . . [which did] not constitute an agreement, an offer to enter an agreement, or a commitment to lend".  The proposal stated: "Collateral assignment of life insurance with respect to the life of Chris Kanning in the amount of $700,000 will be required".  It further stated: "If this proposal is acceptable, please sign the enclosed copy and return it to [Banco]".  Mr. Kanning signed the proposal in his capacity as BEMK president, and both Kannings signed that same document as guarantors.  In short, by signing that financing proposal, Mrs. Kanning acknowledged that the assignment of a life-insurance policy would be a condition if a loan was offered.

Therefore, on 2 November, Banco provided the Kannings with a loan-offer letter, which included a checklist detailing the documents it required prior to closing the loan.  The loan-offer letter was signed by Mr. Kanning as president and Mrs. Kanning as director, and by both as guarantors.  Pursuant to that checklist, the Kannings were required to submit copies of a life-insurance policy for Mr. Kanning in the amount of $695,900, and of an

No. 15-50342

assignment transferring that policy to Banco.  But, as of late November, Mr. Kanning was unable to obtain a policy in the required amount.

As an alternative, he and Banco agreed to use his existing life-insurance policy as substitute collateral.  That existing policy for $500,000 had been issued in 2006 by USAA Life Insurance Company, with Mrs. Kanning as the named beneficiary.  And, of significance to the issues at hand, the policy permitted assignments "while the Insured is alive".  Concerning such assignments, it stated, in relevant part:

> We will not be responsible for the validity or sufficiency of any assignment.  To be binding on us, an executed assignment must be by Written Request and consented to by any Irrevocable Beneficiary.  Your rights and any Beneficiary's interest will be subject to the assignment.

For that assignment provision, the policy defined "Written Request" as "[a] request written to us and received by us" which "must be signed, dated, and notarized (if required by the form) *on a form satisfactory to us or provided by us*".  (Emphasis added.)

On 21 November, Mr. Kanning signed, and had notarized, a form assigning the USAA policy to Banco.  The form, *which was drafted by USAA*, was not signed by either Banco or USAA.  Mr. Kanning provided the form to both Banco and USAA.

By a 23 November response letter to Mr. Kanning, USAA stated:  "We were unable to complete the collateral assignment as requested".  Concomitantly, USAA noted in its internal records that the USAA assignment form, signed by Mr. Kanning, was missing Banco's signature and certain tax and corporate information.

Also on 23 November, Banco prepared an internal "Loan File Change Memo" reflecting, in part, "[c]hanges to life insurance".  The memo stated:  Mr.

3

No. 15-50342

Kanning was "unable to obtain a life insurance policy to meet the loan requirement"; therefore, he would "assign his existing life insurance policy ($500[,000]) as collateral". It further stated that Banco originally required a policy in the amount of $695,900 as collateral, but the agreement was amended to reflect a "[c]ollateral assignment of *existing* life insurance in the amount of *$500,000*". (Emphasis in original.) Banco's officers subsequently approved the memo's recommendations.

Banco provided the Kannings on 29 November with an updated checklist for the closing, highlighting documents that were either absent or deficient. *The checklist showed Banco had received a copy of the USAA policy in the amount of $500,000.* (Neither the checklist, nor the record, reflects when, or from whom, Banco received the policy. In any event, Mrs. Kanning does not dispute its receipt by Banco.) Banco, however, requested that Mr. Kanning re-submit a copy of the assignment. Next to the paragraph concerning the assignment were the words "POST CLOSING". That paragraph stated: "Received incorrect copy – Needs to be re-done showing an assignment to Banco Popular North America instead of Banco Popular or Banco Popular N.A.". There is no evidence Mr. Kanning ever re-submitted the assignment form.

The loan closing occurred on 3 December: BEMK and Banco executed a SBA note in the amount of $695,900; and both Kannings executed unconditional guarantees, each pledging to pay "all amounts due under the [SBA note] when [Banco] makes written demand". That same day, Mr. Kanning submitted to Banco a notarized "Post-Closing Affidavit", which stated: "I guarantee to provide Lender with the original Life Insurance Policy and the Assignment of Life Insurance in the amount of $695,900 listing Banco Popular North America as the beneficiary and lost [sic] payee of such life insurance policy". Next to that paragraph was handwritten "Received policy NOT assignment"; it is unclear when, or by whom, that comment was written.

4

No. 15-50342

In any event, although the stated policy amount is erroneous, it is undisputed that the previously agreed upon USAA-policy for $500,000 was delivered to Banco before the loan closing.

Approximately two years later, by letter in February 2010, Banco requested Mr. Kanning provide "proof of the recorded Collateral Assignment of [the policy]". The letter noted the original due date for the proof of assignment was 13 May 2008. It further stated: USAA had no record of an assignment; and, in order to complete the process, Mr. Kanning needed to sign and notarize a form provided by USAA. Although Banco requested he return the form within 20 business days, there is no evidence he did so.

Following the February 2010 request, BEMK declared Chapter 7 bankruptcy in July. As a result, according to an affidavit filed in district court in this action, Banco "recovered the inventory collateral of [BEMK] in the possession of the bankruptcy trustee". According to that affidavit, "[o]n July 19, 2012, the sum of $13,592.40 was paid to [Banco] by the bankruptcy trustee", and there was a "remain[ing] indebtedness due and owing on the SBA note . . . of $664,876.94 as of December 5, 2014".

Following Mr. Kanning's death in January 2012, Mrs. Kanning presented a claim for the USAA-policy proceeds. As part of her application, she completed a "Claimant's Statement", which asked: "Has this policy been pledged as collateral for a loan? If yes, with whom?" Mrs. Kanning answered "No". That January, USAA approved her claim, and paid her the policy proceeds.

That August, Mrs. Kanning filed a Chapter 7 bankruptcy petition. Under "[i]nterests in insurance policies", she scheduled the USAA-policy proceeds as personal property, and listed their value as $452,549.06. She then scheduled that sum as exempt under Texas law. Due to her status as a personal guarantor for the SBA note, she listed Banco as an unsecured

5

No. 15-50342

creditor, and stated it had a claim for $577,591.36. Banco did not object to Mrs. Kanning's listing the USAA-policy proceeds as exempt, nor did it pursue an adversary proceeding against her. She was granted a Chapter 7 discharge in December 2012.

According to Mrs. Kanning's deposition in this action: the policy proceeds paid her in January 2012 were deposited in a savings account; that November, one month prior to her bankruptcy discharge, she used a portion of the proceeds to purchase a home worth "approximately $340,000"; and the remainder of the proceeds were used to pay off existing debt and for home improvement.

Banco filed this diversity action against Mrs. Kanning in March 2013, seeking, *inter alia*, a declaratory judgment that it had the right to possess the USAA-policy proceeds (in other words, that Banco had a lien against them), and damages for conversion in the amount of those proceeds. Mrs. Kanning counterclaimed, seeking a similar declaratory judgment in her favor, and contending that Banco's conversion claim was in contempt of her bankruptcy discharge. And, in a third-party complaint against USAA, she maintained that, if Banco had an actionable conversion claim, it was against USAA, because it had a duty to pay Banco.

In granting USAA's motion to dismiss, the district court adopted a magistrate judge's report and recommendation that the claimed assignment was not valid against USAA because: Banco neither signed nor notarized the assignment form; its tax ID number was missing; and USAA did not accept the assignment. The remaining parties, Banco and Mrs. Kanning, filed cross-motions for summary judgment.

Mrs. Kanning's was referred to a magistrate judge, who recommended dismissing Banco's declaratory-judgment request and conversion claim. After reviewing the cross-motions and the magistrate judge's recommendations, the

district court agreed with the recommendation that, because the claimed assignment did not comply with the terms of the USAA policy, it was not enforceable against Mrs. Kanning.   Accordingly, the court awarded Mrs. Kanning summary judgment against Banco's declaratory-judgment request and conversion claim.

On the other hand, the court awarded Banco summary judgment against Mrs. Kanning's contempt counterclaim, concluding:  Banco's lien, although not enforceable against Mrs. Kanning, survived her bankruptcy discharge, thereby giving rise to valid post-discharge claims; and, because the lien survived, Banco's attempt to recover the proceeds was not in contempt.  The court also awarded Banco summary judgment against Mrs. Kanning's intentional-infliction-of-emotional-distress claim, and rejected her request for a declaratory judgment.

## II.

Banco appeals the summary judgment against its declaratory-judgment request and conversion claim; Mrs. Kanning, the summary judgment against her contempt claim.   Banco asserts the court erred in concluding Banco's claimed assignment was unenforceable against Mrs. Kanning because it was not enforceable against USAA.  In that regard, Banco contends, *inter alia*:  Mr. Kanning intended to, and did, assign the USAA policy to it; and, the policy does not contain an anti-assignment clause.  In contesting the summary judgment against her contempt claim, Mrs. Kanning maintains, *inter alia*: Banco's conversion action is an *in personam* tort claim, barred by her bankruptcy discharge.

A summary judgment is reviewed *de novo.  E.g., Cal-Dive Int'l, Inc. v. Seabright Ins. Co.*, 627 F.3d 110, 113 (5th Cir. 2010).  A movant is entitled to summary judgment if he shows there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law.  Fed R. Civ. P. 56(a).

No. 15-50342

"The evidence should be viewed in the light most favorable to the non-moving party, and this court should refrain from making credibility determinations or from weighing the evidence." *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012) (internal quotation marks omitted).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When parties file cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014).  Each motion is, of course, reviewed *de novo*.  *See*, *e.g.*, *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 & n.1 (5th Cir. 1999).

## A.

Regarding Banco's declaratory-judgment request and conversion claim, first considered is whether Mr. Kanning assigned the USAA policy to Banco.  If he did, next considered is whether that assignment is enforceable.  Providing it is, finally considered is whether the assignment establishes a foundation for a conversion action.  Because this is a diversity action, pursuant to the *Erie* doctrine, Texas substantive law applies.  *E.g.*, *Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 834 (5th Cir. 2014).

### 1.

Under Texas law, "[a]n assignment is the act by which one transfers to another, or causes to vest in another, his right of property".  *Highland Park State Bank v. Salazar*, 555 S.W.2d 484, 487 (Tex. Civ. App. 1977).  In that regard, an assignment is created upon a manifestation of an intention to transfer a right to another.  *See Commercial Structures & Interiors, Inc. v. Liberty Educ. Ministries, Inc.*, 192 S.W.3d 827, 833 (Tex. App. 2006). In a prior Texas diversity action, this court, citing the Restatement (First) of Contracts

149(1), noted:  An assignment is "a manifestation to another person by the owner of a right indicating his intention to transfer, *without further action or manifestation of intention*, his right to such other person or a third person". *Wolters Vill. Mgmt. Co. v. Merchs. & Planters Nat'l Bank of Sherman*, 223 F.2d 793, 798 (5th Cir. 1955) (emphasis added).  In short, no "further action or manifestation of intention by the *obligee* [Mr. Kanning]" is required.  *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 334 (5th Cir. 2005) (emphasis added) (quoting Restatement (Second) of Contracts § 324 (1981)).  Such a manifestation "may be made either orally or by writing", unless barred by contract.  *Id.*

"An assignment may be shown by either direct or circumstantial evidence."  *Sorenson v. Dawdy*, 196 S.W.2d 687, 690 (Tex. Civ. App. 1946).  In analyzing a writing to determine whether an assignment was made, it is necessary to "examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless".  *Harris*, 426 F.3d at 334.  Although contractual terms are read in accordance with their plain meaning, if a contract is ambiguous, due to its being "subject to two or more reasonable interpretations", extrinsic evidence may be considered.  *Id.*

Crucially, the manifestation of an assignment must convey the present intent of the owner to transfer his rights to another.  *See Commercial Structures*, 192 S.W.3d at 833–34.  For example, "the phrases 'agree to convey' and 'agree[ ] to assign' by themselves indicate a future, or prospective, intent to convey and assign rather than a present intention".  *Id.* at 833.  Language such as "we wish to extend an assignment", which "clearly contemplates some further act to complete [an assignment]", stands in contrast to language such as "we have assigned" or "we hereby assign", which does not.  *Wolters*, 223 F.2d at 798.

No. 15-50342

a.

The requisite *de novo* review of the record demonstrates that, as early as October 2007, Mr. Kanning and Banco discussed the assignment of a life-insurance policy as collateral for the loan. Originally, Banco requested a policy in the amount of $700,000, but later requested one for $695,900. Subsequently, Banco and Mr. Kanning agreed to use his existing USAA policy as collateral, as reflected in a 20 November SBA loan-authorization form: "Life Insurance, satisfactory to [Banco] . . . on the life of Christopher J. Kanning in the amount of $500,000". The record is silent as to when Mr. Kanning received that loan-authorization form. In any event, the next day, on a USAA-prepared form entitled "Assignment of Contract as Collateral", Mr. Kanning stated he "hereby assign[ed], transfer[red], and set over" his rights in the USAA policy to Banco. Mr. Kanning signed, and had notarized, his portion of the form, and left blank the areas for Banco and USAA to complete. But, as discussed *supra*, neither Banco nor USAA signed the form.

Mrs. Kanning contends Mr. Kanning's actions did not constitute an assignment of the USAA policy because, "a number of further actions were necessary to complete [it]", including the submission of Banco's tax-identification information and USAA's acceptance of the policy. Her assertions, however, impose a more onerous standard than Texas law requires. As discussed above, an assignment is made when an owner of a right manifests his present intent to transfer that right to another. *See Commercial Structures*, 192 S.W.3d at 833–34. Mr. Kanning's actions evince a clear intent to transfer the USAA policy, and the language he used ("hereby assign") demonstrated his present intent to do so. *See Wolters*, 223 F.2d at 798.

b.

Mrs. Kanning's related assertion that Mr. Kanning only made an offer to assign the USAA policy fails for several reasons. First, as discussed above,

No. 15-50342

Mr. Kanning signed and notarized a USAA-prepared "Assignment of Contract as Collateral", in which he unambiguously transferred to Banco, *inter alia*, the right to receive policy proceeds.  Second, although Mrs. Kanning relies heavily on the 3 December post-closing affidavit (in which Mr. Kanning stated he was to provide Banco a policy in the amount of $695,900), Mr. Kanning's actions surrounding 21 November 2007 demonstrate that he made an offer to assign the USAA policy, and the offer was accepted by Banco.  As discussed below, this offer and acceptance is demonstrated by, *inter alia*, the USAA policy's being delivered to Banco, as showed in the updated checklist for closing provided to Mr. and Mrs. Kanning on 29 November.  Again, the delivery of that policy is *not* contested by Mrs. Kanning.

In the days following the assignment, Mr. Kanning exchanged several e-mails with Banco in which he noted his conversations with USAA about the assignment form, which needed to be "signed and notarized by [Banco]".  Moreover, Banco's internal "Loan File Change Memo", completed two days after Mr. Kanning executed the assignment form on 21 November, stated that Banco was to accept his existing life-insurance policy "in the amount of $500,000".  Although Banco asked him to resubmit the assignment form, due to Mr. Kanning's misprinting its name, nothing about the above circumstances indicates an offer and rejection of an assignment, as Mrs. Kanning contends.

In addition, Banco's making the loan, and the acceptance of the funds provided by it, demonstrate a meeting of the minds.  The loan closing occurred after extensive discussions between Mr. Kanning and Banco, in which Banco made clear that the assignment of an insurance policy (later, agreed to be the USAA policy) was a predicate to the loan.  Needless to say, judicial notice can arguably be taken that Banco, without any supporting documentation, would *not* have suddenly waived this requirement and disbursed almost $700,000.

11

No. 15-50342

And, following the loan closing, the annotation to Mr. Kanning's 3 December "Post-Closing Affidavit" stated the policy had been received by Banco.

Accordingly, even in the light of the error in the post-closing affidavit regarding the amount of the policy, the record demonstrates that Mr. Kanning intended to, and did, assign the USAA policy to Banco. Crucially, as discussed above, the 29 November checklist, as well as the 3 December post-closing affidavit relied upon by Mrs. Kanning, demonstrate Banco had received a copy of the USAA policy. Mrs. Kanning's assertions about information being absent from the assignment form speaks *not* to whether Mr. Kanning intended to make an assignment, but to whether it was enforceable, as discussed below.

2.

Mrs. Kanning contends the assignment cannot be enforced against her because: she is the beneficiary, *not the assignor*, of the USAA policy; and, the assignment was not effective as to USAA. As discussed *infra*, whether the assignment was effective against USAA is irrelevant as to its effectiveness against Mrs. Kanning, and nothing in the policy language forecloses its enforceability against her.

a.

Mrs. Kanning does not cite any relevant authority in support of her proposition that an assignment cannot be enforced against her because she is the beneficiary, not the assignor, of the USAA policy. Instead, she merely notes that "[a]n assignee stands in the shoes of the assignor". Along that line, she avers that, because the assignment is ineffective against USAA, it must be invalid against her "because no rights in the policy were transferred".

Mrs. Kanning's contentions concerning her beneficiary status are arguably waived, due to her failure to adequately brief them. *E.g.*, *United States v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000). In any event, it is not necessary to address them because they are intertwined with her overarching

No. 15-50342

assertion, discussed *infra*, that the enforceability *vel non* of the assignment as to USAA is the dispositive issue.

b.

Neither party contests the district court's conclusion that, because the assignment was not signed and accepted by USAA, as required by the policy, it is not effective as to USAA.  On the other hand, they disagree, of course, on whether this affects the assignment's enforceability as to Mrs. Kanning.  She maintains the USAA policy enumerates strict requirements concerning assignments, and Mr. Kanning's failure to comply with them renders the assignment unenforceable.  Banco asserts:  the court wrongfully construed the policy provision as an anti-assignment clause; and the enforceability of the assignment against USAA is irrelevant.  Accordingly, the threshold question is whether the language in the USAA policy constitutes an anti-assignment clause.

i.

Although a review of Texas precedent does not provide a singular definition of what constitutes an anti-assignment clause, Texas courts' treatment of various clauses is instructive.  It goes without saying that, generally, Texas law permits assignment of insurance policies "in a manner and to the extent not prohibited by the policy".  Tex. Ins. Code Ann. § 1103.055(2).  Along that line, "[n]on-assignment clauses have been consistently enforced by Texas courts".  *Tex. Farmers Ins. Co. v. Gerdes*, 880 S.W.2d 215, 218 (Tex. App. 1994).  Obviously, "where a contract expressly states that a right to payment arising under it is non-assignable, full force and effect must be given to this provision".  *Cloughly v. NBC Bank-Seguin, N.A.*, 773 S.W.2d 652, 655 (Tex. App. 1989).  "A successful attack on an anti-assignment clause may be made through the application of contract law."  *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721 (Tex. App. 2004).

No. 15-50342

Assignment clauses analyzed by Texas courts have varying language, of course. Some prohibit assignments outright: "[N]or shall [a party] have the power to sell or mortgage or encumber [settlement payments] . . . by assignment or otherwise". *Id.* at 716. Others bar assignments without mutual assent of the original contracting parties: "Your rights and duties under this policy may not be assigned without our written consent". *Gerdes*, 880 S.W.2d at 218; *see also Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 553 (Tex. 1986) ("[t]his commitment is nontransferable or assignable . . . unless specifically approved in writing"); *Tex. Dev. Co. v. Exxon Mobil Corp.*, 119 S.W.3d 875, 879 (Tex. App. 2003) ("[Party] shall not assign this Agreement . . . without the prior written approval of Exxon"); *Cloughly*, 773 S.W.2d at 655 ("[s]eller . . . shall not have the right to make any assignment or transfer . . . without the prior written consent of the [p]urchaser"). And others appear to implicitly permit assignment, but limit enforceability against the obligor (here, USAA): "No assignment of your account . . . [is] to be binding upon this company unless such assignment is accepted and acknowledged by the company's treasurer". *Reef v. Mills Novelty Co.*, 89 S.W.2d 210, 211 (Tex. Comm'n App. 1936, judgm't adopted); *see also Tex. Pac. Indem. Co. v. Atl. Richfield Co.*, 846 S.W.2d 580, 582 (Tex. App. 1993) ("[a]ssignment of interest under this policy shall not bind the company until its consent i[s] endorsed hereon").

As noted, the USAA policy states: "While the Insured is alive, you may . . . [a]ssign this policy". Along that line, as also discussed *supra*, the related assignment provision at issue states:

> We will not be responsible for the validity or sufficiency of any assignment. *To be binding on us*, an executed assignment must be by Written Request and consented to by any Irrevocable Beneficiary. Your

14

No. 15-50342

rights and any Beneficiary's interest will be subject to
the assignment.

(Emphasis added.)  Again, Banco asserts:  this provision does not constitute an anti-assignment clause; and the court erred in reading it as such.

Obviously, the above assignment provision does not forbid assignments; to the contrary, the USAA policy expressly permits them.  (Indeed, the form on which Mr. Kanning made the assignment to Banco was prepared by USAA.)  Therefore, the provision cannot be read as completely barring assignments, as was the case in *Johnson*.  *See* 148 S.W.3d at 716.  Similarly, it does not require USAA's written consent prior to making assignment.  *See, e.g.*, *Gerdes*, 880 S.W.2d at 218.  Instead, the provision is most similar to the one in *Reef*, discussed *infra*:  it permits assignments, but limits their enforceability against the obligor (here, USAA) without its consent.  *See* 89 S.W.2d at 211.

In sum, the USAA policy provision is not an anti-assignment clause.  Therefore, at issue is whether the assignment is enforceable against Mrs. Kanning.

ii.

Unlike the above-described Texas cases, Banco seeks to enforce the assignment against a beneficiary (Mrs. Kanning), not an obligor (USAA).  Although our review is *de novo*, a review of the district court's decision helps illuminate the distinctions between this action and Texas precedent concerning enforceability of assignments.

In agreeing with the magistrate judge's recommending the assignment was unenforceable, the district court drew parallels to *Island Recreational*, in which an anti-assignment clause prohibited any assignment "unless specifically approved in writing" by the obligor.  710 S.W.2d at 553.  The district court stated:  "[T]he decision in *Island Recreational* makes clear that, under Texas law, an anti assignment provision sweeps broadly, and an attempted

15

No. 15-50342

assignment which violates such a provision is ineffective". *Banco Popular N. Am. v. Kanning*, C.A. No. 1:13-CV-00200-RP, Doc. No. 64, at 14 (W.D. Tex. 9 Mar. 2015).  Therefore, the court concluded, because the assignment was not valid as to USAA, the USAA-policy provision regarding assignments rendered the assignment unenforceable as to Mrs. Kanning.

As discussed above, however, the USAA policy's assignment provision is unlike the provision at issue in *Island Recreational*.  That opinion, as well as the others cited by the district court, concerned traditional anti-assignment clauses:  they required consent from the obligor (here, USAA) prior to making an assignment. *E.g.*, *Island Recreational*, 710 S.W.2d at 553.  Again, the USAA policy does not require its consent to make an assignment; rather, it only requires its consent for the assignment to be effective *against it*.

In *Reef*, the Texas Commission of Appeals (a discontinued court which assisted the Texas Supreme Court; it often adopted the Commission's judgments) encountered an assignment provision with language similar to that in the USAA policy.  There, a salesman for Mills Novelty Co. assigned his sales-commission account to Reef.  89 S.W.2d at 210.  When notified of the assignment, Mills refused to accept or consent to it, and subsequently paid the amount due under the account to its salesman. *Id.*  In response to Reef's action to enforce the assignment, Mills invoked an assignment provision contained in the salesman's contract:  "No assignment of your account . . . [is] to be binding upon this company unless such assignment is accepted and acknowledged by the company's treasurer". *Id.* at 211.  The provision was upheld, resulting in a judgment for Mills. *See id.*  As discussed above, and unlike the claim at issue here, Reef was attempting to enforce an assignment against the company, not a third party.

Texas courts do not appear to have directly addressed enforceability in the context of the present circumstances.  In *dicta*, however, the Texas Court

of Appeals has noted that an assignment may be enforceable between an assignor and assignee even when it does not comply with an insurance policy's anti-assignment provision. *See Dr. Michael Hoffman & Assocs. ex rel. Dallas Med. Holdings, Ltd. v. St. Paul Guardian Ins. Co.*, No. 05-04-00902-CV, 2005 WL 1950848, at \*2 (Tex. App. 16 Aug. 2005) (memorandum op.). In *Hoffman*, the anti-assignment clause forbade assignment without "written consent" of the insurer. *Id.* After holding the assignment was unenforceable against the insurer, the court stated that it was "perhaps effective" between the assignor and assignee. *Id.*; *see also Reuben H. Donnelley Corp. v. McKinnon*, 688 S.W.2d 612, 615 (Tex. App. 1985) (anti-assignment provision forbids assignment, but does not render assignment ineffective).

Although neither *Hoffman* nor *Donnelley* have been overruled, at least one Texas Court of Appeals decision has contested *Donnelley*'s reasoning. *See Tex. Dev. Co.*, 119 S.W.3d at 881. In *Texas Development Co.*, an assignee maintained an assignment was effective, despite its non-compliance with a contract's anti-assignment clause, because the clause did not state that any assignments would be void. *Id.* In rejecting *Donnelley*'s conclusion that such a clause "only forbids assignment; it does not render an assignment ineffective", the court noted it was bound by both *Reef* and *Island Recreational*, where anti-assignment clauses were held to be enforceable despite not containing "(1) language that any assignments made in violation of this provision were void or (2) language prohibiting the transfer of any rights". *Id.*

The assignment provision in the USAA policy, as stated *supra*, is distinguishable from the broader language used in *Reef* and *Island Recreational*. First, as discussed *supra*, the policy *expressly permits assignments*. Moreover, not only is it silent regarding enforceability of assignments to persons or entities other than USAA, it expressly disclaims responsibility "for the validity or sufficiency of any assignment". Although

Mrs. Kanning maintains the assignment is unenforceable against her because it is unenforceable against USAA, she fails to cite analogous precedent to support this assertion, nor have we found any.

Conversely, Banco urges adoption of the reasoning in *Massachusetts Mutual Life Insurance Co. v. Sanders*, an interpleader action which is factually analogous. 787 F. Supp. 2d 628 (S.D. Tex. 2011). Similar to the USAA policy involved in the cross-appeals at hand, the one in *Sanders* stated, *inter alia*: "This policy may be assigned. But for any assignment to be binding on us, we must receive a signed copy of it at our [office]. We will not be responsible for the validity of any assignment". *Id.* at 636. Also similar to this action, the *Sanders* policy was assigned as collateral for a SBA loan and, following the death of the insured, the policy beneficiary: declared bankruptcy; did not schedule the proceeds as an asset of the bankruptcy estate; and, made a claim for payment. *Id.* at 631–32. Unlike here, instead of paying the beneficiary's claim, the insurer filed an interpleader action. *Id.* at 633. The beneficiary contended the assignment was invalid because neither he nor the lender had signed it. *Id.* at 638.

Applying Texas law, the *Sanders* court cited this court's definition of an assignment as stated in *Harris* and *Wolters* (discussed *supra*). *Id.* It then concluded that, because "a writing is not necessary to validly assign a right, certainly the endorsement of the third party to whom the right is assigned is not necessary to effectuate an assignment". *Id.* As a result, it held the assignment to be "valid". *Id.*

*Sanders*' reasoning is persuasive. Mrs. Kanning asserts *Sanders* is inapposite because it involved interpleader, and contends that, if Banco has any right to recover the proceeds, it is against USAA and not against her. That *Sanders* concerned interpleader, however, did not bear on the assignment's

enforceability; rather, it simply established who had a right to the policy proceeds between the beneficiary and the assignee.

Therefore, affording the USAA policy's assignment provision its plain meaning, it is enforceable against Mrs. Kanning. *See Harris*, 426 F.3d at 334. As a result of that enforceable assignment, Banco has a lien against the policy proceeds.

3.

Accordingly, at issue is whether that lien can be the basis for a conversion action against Mrs. Kanning. For the reasons that follow, Banco's interest in those proceeds created an actionable property right.

a.

"Conversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another which is to the exclusion of, or inconsistent with, the owner's rights." *Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760 (Tex. App. 1993). To prevail on its conversion claim, Banco must show: "(1) [it] owned, *had legal possession, or was entitled to possession* of the property[;] (2) [Mrs. Kanning] assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with [Banco's] rights[;] and (3) [Mrs. Kanning] refused [Banco's] demand for return of the property". *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App. 2003) (emphasis added). As discussed below, the three elements for conversion were satisfied.

Based on its lien, Banco was entitled to legal possession of the USAA-policy proceeds. Mrs. Kanning's election to receive them (answering "No" to USAA in the Claimant's Statement in response to whether the policy had been pledged as collateral) constitutes an unauthorized "exercise of dominion and control" over the property, to the exclusion of Banco's rights. *Id.*

Moreover, as reflected *supra*, Mrs. Kanning arguably knew of the assignment when she completed the Claimant's Statement.  As discussed above:  she signed the 14 October 2007 financing proposal that stated an assignment of a life insurance policy was a requirement for the loan; she signed the 2 November loan-offer letter, which included a checklist stating that Banco required both a copy of Mr. Kanning's life-insurance policy and an assignment of that policy; the 29 November updated checklist for the closing, provided to Mr. and Mrs. Kanning, showed that a copy of the USAA policy had been received by Banco; and, on 3 December, the closing date of the loan, she executed an unconditional guarantee, and agreed to "pay all amounts due under the [SBA] Note when [Banco] makes written demand".  Additionally, both the guarantee and the SBA Note defined "collateral" as "any property taken as security for payment of the Note or any guarantee of [the] Note".  In her guarantee, Mrs. Kanning pledged, *inter alia*, to "preserve the Collateral pledged by Guarantor to secure this Guarantee".  As stated above, Mr. Kanning assigned the USAA policy as collateral on 21 November 2007.

"Documents incorporated into a contract by reference become part of that contract." *E.g.*, *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App. 2013).   And, "a person who signs a contract must be held to have known what words were used in the contract and to have known their meaning, and he must be held to have known and fully comprehended the legal effect of the contract". *Tamez v. Sw. Motor Transp., Inc.*, 155 S.W.3d 564, 570 (Tex. App. 2004).   Along that line, Mrs. Kanning arguably knew and understood what "Collateral" meant:  the assignment of the USAA policy.

Finally, the third element for conversion—demand and refusal for return of the property—need not be satisfied if "[Mrs. Kanning's] acts manifest a clear repudiation of [Banco's] rights". *Edmunds v. Sanders*, 2 S.W.3d 697, 703 (Tex.

No. 15-50342

App. 1999).  Her actions did so.  Therefore, Banco need not show she refused its demand for return of the proceeds.

b.

Although Banco has shown the elements for conversion, Mrs. Kanning additionally contends, *inter alia*, that Banco seeks a money judgment, which cannot form the basis for a conversion claim.  In that regard, "[a] lien is not itself property, but is a right to have satisfaction out of property to secure the payment of debt".  *Crutcher v. Cont'l Nat'l Bank*, 884 S.W.2d 884, 888 (Tex. App. 1994).

And, money cannot be converted unless it can be identified as a "specific chattel", as opposed to an indebtedness that can be discharged by a general payment from any source.  *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 456 (Tex. App. 2006). Generally, "[a]n action for conversion of money will only lie where the money is (1) delivered for safekeeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by its keeper".  *Id.*

In *Paschal*, "[t]he critical inquiry . . . [was] whether the maturation of [life insurance] policies that occurs when the insured dies transforms the policies' proceeds into an indebtedness that may be discharged by the payment of money".  *Id.*  There, an employee embezzled money from his employer, and used it to pay premiums on several life-insurance policies, for which his wife, Paschal, was the beneficiary.  *Id.* at 442.  Following discovery of his misdeeds, the employer "sought to impose a constructive trust on the life insurance proceeds".  *Id.*  It also sued Paschal, contending she was liable for:  civil-conspiracy (based on her unspecified role in committing embezzlement with her husband); and conversion (based on her being paid the policy proceeds following his death).  *Id.* at 442–43.

21

No. 15-50342

In appealing a jury verdict in favor of the employer on both bases, Paschal claimed that life-insurance proceeds could not form the basis of a conversion action. *Id.* at 456. The Texas Court of Appeals rejected this assertion, noting: "The right to receive insurance proceeds payable at a future but uncertain date is 'property[ ]'". *Id.* (citing *Marineau v. Gen. Am. Life Ins. Co.*, 898 S.W.2d 397, 402 (Tex. App. 1995)); *accord Brown v. Lee*, 371 S.W.2d 694, 696 (Tex. 1963). The court concluded that, "[u]nder the facts of [Paschal's] case . . . the policy proceeds remained property subject to conversion". *Paschal*, 215 S.W.3d at 456. Due to the fact the policy premiums were paid with embezzled money, the court noted that Paschal was required to keep their proceeds in trust for the benefit of the employer. *Id.* Therefore, because she elected to obtain policy proceeds for her own benefit, Paschal was found to have committed conversion. *Id.* at 456–57. "To hold otherwise", the court noted, "would permit a coconspirator to profit from her wrongdoing". *Id.* at 456.

The facts giving rise to Banco's conversion claim are not identical to those in *Paschal*. Most notably, Mr. Kanning did not purchase the USAA policy with embezzled funds, and there is no evidence in the summary-judgment record of intentional wrongdoing by either him or Mrs. Kanning. There are, however, several key similarities. Both actions involve a third party with a right to policy proceeds: the employer in *Paschal* (by virtue of a constructive trust) and Banco (by virtue of the assignment). Both also involve policy beneficiaries who made claims to proceeds which they had no right to receive. That Mrs. Kanning may not have acted in bad faith, like Paschal (who, again, also committed civil conspiracy), is immaterial; as shown above, a conversion claim does not require a showing of *scienter*. *See Automek*, 105 S.W.3d at 63. Therefore, consistent with Texas law, Banco's right to the policy proceeds created a property interest sufficient to support an actionable conversion claim.

22

No. 15-50342

In sum, the district court erred in awarding summary judgment to Mrs. Kanning against Banco's declaratory-judgment request and conversion claim. Conversely, Banco is entitled to summary judgment for its request and claim. As resulting relief, Banco seeks, *inter alia*, immediate possession of the USAA-policy proceeds; an equitable lien on the property purchased by Mrs. Kanning in November 2012 for approximately $340,000, using part of those proceeds; and post-judgment interest.  Therefore, on remand, and consistent with this opinion, the district court is to conduct further proceedings to determine the form and amount of the resulting relief to be awarded Banco.

B.

Next at issue are Mrs. Kanning's assertions that the court erred in granting summary judgment against her contempt claim.  Again, a summary judgment is reviewed *de novo*.  *E.g.*, *Cal-Dive Int'l*, 627 F.3d at 113.

Mrs. Kanning maintains:  Banco's action is *in personam*, not *in rem*, and such an action is barred by her bankruptcy discharge; the court improperly applied the summary-judgment standard; and it erred by not ruling on Banco's assertion that a contempt claim can only be pursued in bankruptcy court.

A bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor".  11 U.S.C. § 524(a)(2).  To show a willful violation of her discharge, Mrs. Kanning must show Banco both knew about, and intended the actions that violated, the discharge.  *In re Hardy*, 97 F.3d 1384, 1390 (11th Cir. 1996). Banco does not dispute it knew about the discharge; therefore, the relevant inquiry is whether it intentionally committed acts that violated it.

1.

A bankruptcy "[d]ischarge does not extinguish the debt, rather it removes any *in personam* remedy that the creditor had against the debtor prior

to the bankruptcy while leaving in place the remedies the debtor has against the property *in rem*".  *In re Thaw*, 620 F. App'x 304, 307–08 (5th Cir. 2015) (citing *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991)).  "In order to characterize the action[ ] as *in rem . . .*  or *in personam*, we first must look behind the form of the action[ ] to the gravamen of [the] complaint[ ] and the nature of the right[ ] sued on." *Chapman v. Deutsche Bank Nat'l Tr. Co.*, 651 F.3d 1039, 1045 (9th Cir. 2011) (internal quotation marks omitted).  As discussed above, a conversion claim arises out of the unlawful exercise of control over another's *property*.  *Whitaker*, 850 S.W.2d at 760.  Therefore, on its face, Banco's claim is *in rem*.

Looking behind the form of the claim, Mrs. Kanning contends that Banco seeks an *in personam* money judgment against her.  In its complaint, Banco claims Mrs. Kanning "did wrongfully, and without authority, exercise dominion and control over [the policy proceeds]"; and that, due to Banco's status as assignee, it was entitled to the proceeds at the time they were converted.  As relief, Banco requested, *inter alia*:  a declaration that it was entitled to the policy proceeds (in other words, that it had a lien); and "[j]udgment against [Mrs. Kanning] in a sum within the jurisdictional limits of this court, together with post-judgment interest at the maximum lawful rate".

Banco's complaint demonstrates its conversion claim centers on recovering the USAA-policy proceeds.  Mrs. Kanning contends, *inter alia*, that, because the requested relief seeks a judgment against her "in a sum within the jurisdictional limits of this court", it cannot be *in rem*.  She avers that "the funds were delivered to [her] for her own use, were subject to a title claim by her, were not intended to be kept segregated, and have since been spent".  These assertions, however, miss the mark:  as established *supra*, Banco had a property interest in the USAA-policy's proceeds by virtue of its assignment.

Along that line, as observed by the district court, Mrs. Kanning overlooks the fact that Texas law permits a lien to be created in monetary proceeds. *See, e.g.*, *Allstate Indem. Co. v. Mem'l Health Sys.*, 437 S.W.3d 570, 575 (Tex. App. 2014). And, "[o]rdinarily, liens and other secured interests survive bankruptcy". *Farrey v. Sanderfoot*, 500 U.S. 291, 297 (1991). Therefore, Mrs. Kanning's protestations that Banco failed to file an adversary proceeding against her are of no avail. Accordingly, because Banco sought to enforce a claim to recover the policy proceeds (which, again, were its property by virtue of its lien), Banco's claim was *in rem*, and, therefore, not in contempt of Mrs. Kanning's discharge.

2.

Finally, we need not address Mrs. Kanning's alternative contentions concerning the summary-judgment standard and the district court's declining to rule on Banco's assertion that a contempt claim can only be filed in bankruptcy court. First, because our review is *de novo*, it is not necessary to reach whether the district court misapplied the summary-judgment standard. Likewise, it is not necessary to consider whether the court should have ruled on Banco's assertion that a contempt claim may only be pursued in bankruptcy court. Mrs. Kanning's contempt claim fails, regardless of the forum in which adjudicated, because Banco's conversion claim was a permissible *in rem* action.

III.

For the foregoing reasons, the judgment is AFFIRMED IN PART and VACATED IN PART, and SUMMARY JUDGMENT is AWARDED Banco. This matter is REMANDED to district court for it to conduct further proceedings to determine, consistent with this opinion, the resulting relief to be awarded Banco, and to enter judgment accordingly.